## Alida Riggs v. The Board of Education of the City of Detroit.

*City of Detroit: Original plan: Interior open spaces: Common council: Land board.* The interior open spaces in the original plan of the city of Detroit were, by the acts of the governor and judges and the early legislation of the territory, set apart to such uses as the city council of Detroit, in its legislative capacity, might "at any time" provide. The land board had no further power or control in the matter, and their subsequent attempt to confine the dedication was void.

*Common council of Detroit: Legislative action: Action as land board.* The acts of the council under the acts of congress were under a different authority from their legislative acts under the state or territorial laws, and they could not be legally identical.

*Common council: Legislative action.* The control of the uses of these lands was vested in the council as a legislature, and was to be exercised from time to time, and the uses were variable. It was not competent for one council to prevent legislative action by a future council, to change a former use.

*Common council: Parks: Power to vacate: Public improvement.* The city of Detroit has power to vacate any of its open spaces or parks at its discretion, when deemed a necessary public improvement, and of this the council is to judge for itself.

*Public library: Public improvement.* The use of a triangle in the old city plan, for a public library, is within the original purposes of the dedication, as well as within the power of the city under its authority to vacate open spaces for public improvements.

*Plan of Detroit.* History of the plan of Detroit referred to.

*Submitted on briefs May 6.    Decided May 7.*

Appeal in Chancery from Wayne Circuit.

*D. B. & H. M. Duffield,* for complainant.

*Alfred Russel,* for defendant.

CAMPBELL, J.

The bill in this cause was filed to prevent the erection of a public library upon a space of ground of a triangular shape, bounded by Gratiot, Farrar, and Farmer streets, in Detroit, and spoken of as "Centre Park," in section seven of said city. Complainant avers that she owns a house and lot, which she purchased and erected under the belief that the land was to be continued as a park.

The bill contains a recital of many facts, upon some of which we have information as recognized or fixed by public laws. The history of the parcel of land referred to appears to be substantially this:

In 1807, it is averred, the governor and judges adopted the plan of this section, under an act of congress of April 21, 1806, to provide for the adjustment of land titles in Detroit. Reference was made to this proceeding in *People v. Jones, 6 Mich., 182,* and it will be unnecessary here to review the whole subject, beyond what may be required for this particular case. The date of the adoption of this section was April 16, 1807.

The act of congress authorized them to lay out a town and adjust titles and make grants, and after satisfying all claims, to use the proceeds of the lands sold to build a court house and jail. The law required them to report their proceedings to congress, which, it appears from the statutes of the United States, was not done until required a second time by a statute of 1830. Their report is found in *Vol. 5, State Papers, "Public Lands."*

In 1806 a law was passed by the governor and judges, laying down a very vague outline of their proposed plan, defining one triangular section as *section 1,* and providing for other sections to be planned from time to time, subject to such deviation as might be found necessary. The portion of ground adopted by that act as the general basis of the city, was a triangle to be divided into six sections consecutively numbered. As the section where the place in controversy is situated, is section 7, and yet was included in that triangle, it is evident—as it is also very well known —that the plan was subjected to the deviations which had been anticipated. That act is only important in this controversy, as showing that the court house was to be placed in the Grand Circus, the largest public ground on the plan, and the jail was to be built in the vicinity of the court house. It was not until 1815 that this designation was repealed.—See *Territorial Laws, 143, 284.*

In May, 1807, about the time when more of the sections were surveyed, and just after this section was adopted, a further law was passed, making regulations concerning the uses of the various public grounds, and the privileges of lot owners in the streets adjacent to their lots. Some portions of this act are quite important. By section 6 it was provided, " that the squares or other spaces where six and twelve avenues intersected should be planted with trees, as the lot owners fronting thereon should direct, or as the city council should at any time by law provide; *but so as not to impede or obstruct the purpose to which such public space of ground shall be converted, or may be designed.*" `p. 288.` At this time, as already seen, one of these purposes was declared by law to be the erection of a court house and jail. The Campus Martius and Grand Circus were the only spaces coming within this section.

By section 7, of the same act, provision was made for such triangular spaces as the one now under consideration. It is provided: " The internal space of ground, in the middle of every section, shall be reserved for public wells and pumps, for markets, for public schools, for houses for the reception of engines or other articles for the extinction of fires, and the preservation of the property of the inhabitants, for houses for the meeting of religious, moral, literary, or political societies, or other useful associations, and, generally, for such purposes of utility or ornament as the city council of Detroit may at any time, by law, provide; or as, otherwise, the inclination and tastes of the proprietors of the lots in such section, or the major part of them, may direct; and in the same manner shall be paved, graveled, planted with trees, or otherwise improved and ornamented." *p. 288.*

It will be observed that the regulations in regard to the large and small spaces differ in some remarkable particulars. In the large spaces the primary purpose is adornment with trees, subject to the other uses, and the power is given to the lot owners fronting on them, to see to the

work until the city take it in hand. In the smaller spaces the primary purpose is for public improvements and buildings, and the ornamentation is secondary, and entrusted, until the city interfere, not to the adjoining lot owners, but to the proprietors of the entire section, or a majority of them. And in both of these sections the action of the city is contemplated as not a single and final and unchangeable determination, but action to be had "*at any time, by law,*" or, in other words, legislative action, which is not in its nature concluded by one exercise. Neither was immediate improvement contemplated.

Under this state of things, the first use to which this land was put was the erection of a jail upon it, in 1819, or thereabouts, which remained until removed, as the bill states, in 1849, by a decree of the circuit court for the county of Wayne. It is not stated under what pretense, and it is not very easy to determine, nor is it now important. Authority to use it was given to the county of Wayne by a territorial act in 1821.—*T. Laws, 857.* It was recognized and reserved by the act of congress which gave the residuary powers of the governor and judges to the city authorities of Detroit;—*5 Laws U. S., 541;* as was also the capitol building on the corresponding triangle west of Woodward avenue—the "court house," which was built there instead of on the Grand Circus, and in which the legislature met until the capital was fixed at Lansing.

The bill avers that after the removal of the jail no other use was made of the space; but it has been inclosed and ornamented as a park.

In 1855 the mayor, recorder and aldermen, acting as a land board, and not as a legislature, passed a formal resolution that this, with other similar spaces, should remain parks, and not be diverted from this character as public parks, or used for any other purpose.

March 17th, 1872, the common council vacated it as a park, and the land board afterwards conveyed it to the city, and the city have leased it to the board of education.

27 mich.—34.

The case is divested of some of the difficulties which have sometimes arisen in such controversies. As decided in *Baker v. Johnston, 21 Mich., 342*, if the original planning of the section amounted to a tender of this space for public uses, it did not specify those uses, and they could only be determined by subsequent action of some or all of the parties concerned. But the governor and judges, being the territorial legislature, and having it in their power, therefore, to regulate all these matters and remedy such uncertainties by law, saw fit to do so. They determined by law that certain uses should be permitted, but not specified or confined absolutely, and they then left the whole matter to be regulated by the local legislative action of the city. It would be a radical change if the power of the city to fix and regulate these uses "at any time" should be taken away. The power was to be exercised by the city under its chartered powers of legislation, and not otherwise. It had no powers to exercise for the United States at that time. And this power over the lands has never been taken away from the city by the state. The present charter allows the council to "control and regulate the same consistently with the purposes and objects thereof" (*Charter, p. 40*); and also to "vacate or abolish" any "public grounds or spaces in said city, whenever they shall deem it a necessary public improvement."—*Chap. 7.*

In *Hinchman v. City of Detroit, 9 Mich., 103*, the power of the city to vacate a portion of the *Campus Martius* was sustained, and it was held this might be done without determining in advance the future uses. And where private property is not taken, the right by authority of legislation to surrender or extinguish public rights has never been questioned.—*2 Smith's Lead Cas., 96 ; People v. Supervisors of Ingham, 20 Mich., 95.*

The vacating of the plat in the present case was no doubt done from abundant caution, and to secure the ultimate fee. But the purpose for which the land is to be used is directly within the original statute of dedication.

The library is a public one, sustained and regulated by a public corporation for city purposes, and the use—if there can be any comparison of such uses—is much more general than the former one could have been. It is emphatically a public use, and one of the few to which special funds are expressly devoted by the constitution of the state.— *People v. Treasurer of Wayne County, 8 Mich., 392; Wayne County v. Detroit, 17 Mich., 390; People v. Controller of Detroit, 18 Mich., 445.* The power to vacate public spaces is very broad, but was not required in this case, as the use is within the dedication.

The action of the council in 1855, acting as a land board, whatever might have been its character, could not have restricted the power given by the charter in this regard. But we can conceive of no way in which that action could become important. Congress gave that body as a land board no legislative powers, and could give them none—for the powers of city legislation must come from the state. The act of congress merely transferred to the land board the residuary lands and funds, which had formerly been held by the governor and judges in the same capacity. They could not recall the action of their predecessors, nor meddle with lands they had disposed of. These lands had been dedicated to public uses in 1807, and had been used, and the deficiency that might have existed in the vagueness of the dedication was remedied by the statute of that year, which gave the city a broad discretion, and retained no control in the land board. Thenceforward the public interest was only subject to legislative interference by the city, or by the sovereignty of the territory or state. The action of the land board in 1855 was, therefore, nugatory, and beyond the jurisdiction of that body, and the land remained subject to the legal discretion of the city, to be exercised by its legislation for the public purposes indicated by the act of 1807, or such other purposes as would be lawful and not be repugnant to that act.

The action complained of is in all respects conformable to law and to the objects of the dedication, and if it should be conceded (which is not to be understood as decided) that complainant has a right to intervene as a lot owner, she must take her property, and any supposed interest it gives her in the triangle, subject to such uses as are lawfully imposed upon it.

It follows that the bill makes out no cause of grievance.

The decree must be reversed, and the bill dismissed, with costs of both courts.

The other Justices concurred.