STATE OF MISSOURI at the Relation of the CITY OF EXCELSIOR SPRINGS, Relator, v. FORREST SMITH, State Auditor.—82 S. W. (2d) 37.

Court en Banc, April 29, 1935.

*Robert T. Stephens, Harris L. Moore, John W. Moore* and *Robert H. Moore* for relator.

1106

*Roy McKittrick*, Attorney General, *Harry G. Waltner, Jr.*, and *Covell R. Hewitt*, Assistant Attorneys General, for respondent.

GANTT, J.—Original proceeding in mandamus. The city of Excelsior Springs seeks to compel the State Auditor to register certain bonds. The facts may be stated as follows:

In and about the city are mineral springs and wells. It is a widely known health resort. Indeed, it owes its existence and growth to the several varieties of mineral waters in that locality. In 1912 it acquired by condemnation Siloam Park, and in 1925 it acquired by condemnation Regent Park. In the condemnation proceedings benefits were assessed against the lands in the benefit district and paid by the owners of said lands. The parks are in the city, and on each is located a mineral spring, maintained at the expense of the city. The drinking water from said springs has been free of charge. The city received no income from either park. It did not own other springs or wells.

In December, 1933, those in authority decided that the city should equip, manage and control the principal springs and wells in and about the city. Thereafter the issuance of bonds for that purpose was duly and legally submitted to the voters of the city at a special election authorized by an act of the Legislature amending the laws relating to cities of the third class. [Laws Ex. Sess., 1933-34, p. 102.] At said election there were 1414 votes for and 16 votes against the proposition. The new sections relating to said cities follow:

"Sec. 6898a. CITIES MAY ACQUIRE PROPERTY—IMPROVEMENTS—MAINTENANCE—OPERATION.—In addition to other powers, the Mayor and Council of cities of the third class are hereby authorized and empowered to acquire by gift, devise, purchase or condemnation, within such cities or within a mile thereof, such real

and personal property as may be necessary or desirable for the purpose of the erection or construction of dams, lake and flood protection systems, bath houses, therapeutic bath houses, mineral water vending houses and in connection therewith, auditoriums and lecture rooms and for the laying of pipe lines for the distribution of mineral waters and to so acquire, improve and operate mineral springs and wells, and to construct all necessary and appropriate buildings and works therefor, and to do any and all things necessary to maintain and operate said properties so acquired and constructed as a self-liquidating revenue producing public project, and for that purpose to lease or convey the same; provided such properties shall be so acquired, constructed and thereafter maintained and operated without increasing the indebtedness of such city and shall not be paid for, maintained or operated by taxes, either general or special.''

''Sec. 6898b. PAYMENT OF PROPERTY ACQUIRED—MANNER—ISSUANCE OF BONDS.—The Mayor and Council of said cities are authorized to accept gifts and grants and to borrow money and execute, issue and negotiate bonds or other securities, for the purpose of paying the cost of acquiring said property or the construction of said buildings or works thereon, and to secure same by mortgages or deeds of trust on said properties and the income and revenue derived therefrom; which said mortgage or deeds of trust shall be a first lien on all said property and all revenues or income therefrom and shall be enforceable as provided therein but shall not be a debt of said city or payable out of any revenue not derived from said property. Said bonds issued under the provisions of this act shall bear interest at a rate not exceeding six per centum per annum, payable annually or semi-annually, shall be executed in such manner and be payable serially in annual installments beginning not later than three years and extending not more than forty years from the date hereof, and at such place or places as the mayor and council shall determine. Any income, receipts, collections and profits from any properties on which such a mortgage or deed of trust has been so executed, shall be held and kept in the city treasury as a separate fund, and payments therefrom shall be made only as provided by said mortgage or deed of trust.''

In substance Section 6898c authorizes the condemnation of land for the purpose stated in the preceding sections, but does not require the establishment of a benefit district or the assessment of benefits.

In substance Section 6898d requires an ordinance authorizing the bonds and the submission of the issuance of the bonds to the voters of the city at a special election.

It will be noted that Section 6898b authorizes the bonds to be secured by a mortgage on the properties acquired by the city for the

purposes stated in said act. In this situation the city sold the parts of Siloam and Regent Parks on which are located mineral wells to citizens of the city for $15,000 in cash. It did so that all the lands on which are located the principal springs and wells in and about the city might be purchased by the city and covered by a mortgage to secure the bonds as required by said act. The city then purchased the parts of said parks so sold to citizens and purchased the lands on which are located the other principal mineral wells in and about the city.

Thereafter the Federal Emergency Relief Administrator of Public Works purchased said bonds in the sum of $516,000 secured by a mortgage as provided in said act, and others purchased said bonds in the sum of $110,000 secured by said mortgage. The mortgage covers the parts of said parks sold to and purchased from said citizens, and covers all said lands and properties and the income derived therefrom.

I. The auditor contends that the amending sections are in conflict with Section 3, Article X of the Constitution. It is provided in said section that taxes can be levied and collected for public purposes only. The amending sections do not provide for the payment of the bonds from money derived from taxation. On the contrary it is provided that the bonds must be paid solely from the income of the properties. Even so, he contends that said sections are invalid because they authorize the city to engage in private business contrary to Section 7, Article IX of the Constitution, which follows:

"The General Assembly shall provide, by general laws, for the organization and classification of cities and towns. The number of such classes shall not exceed four; and the power of each class shall be defined by general laws, so that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions."

The authority given in said section to define the power of each class of cities by general laws does not authorize the Legislature to grant to said cities the power to engage in private business. It only authorizes a grant of general municipal powers. The rule has been stated as follows:

"However great the need in the direction of any particular calling, the interference of the government is not tolerated, because, though it might be supplying a public want, it is considered as invading the domain that belongs exclusively to private inclination and enterprise. We perceive, therefore, that the term 'public purposes,' as employed to denote the objects for which taxes may be levied, has no relation to the urgency of the public need, or to the extent of the public benefit which is to follow. It is, on the other hand, merely a term of classification, to distinguish the object for which, according to

settled usage, the government is to provide, from those which, by the like usage, are left to private inclination, interest, or liberality." [People ex rel. v. Township Board of Salem, 20 Mich. 452.]

It will be noted that the rule proceeds on the theory that the money to be used is derived from taxation. However, the rule as stated is not approved by this court. In Halbruegger v. City of St. Louis, 302 Mo. 572, 262 S. W. 379, it was contended that the construction of a municipal auditorium was not for a public purpose. In the course of the opinion (l. c. 381) we said:

"As has been observed by courts and text-writers, there are instances in which there can be no reasonable doubt that the purpose attempted to be effectuated is not a public purpose. There are others in which it is clear that the purpose is public. Between these two cases lies disputed ground within which the courts are inclined to give much consideration to the effect of the legislative finding which is essentially involved in every legislative declaration that public money may be used for a stated purpose. In solving the question whether a particular purpose is a public one, it is not necessary, in this case, to attempt the formulation of a general rule inflexibly applicable under all circumstances. Efforts of this sort several times have proved not entirely successful. Illustrative of this is the statement of a rule that previous custom and usage in the expenditure of public moneys was determinative of the whole matter. It has been pointed out that the rigid adherence to a standard of that kind clearly would interfere with progress, and would defeat the effectuation of a purpose which changed conditions of life and circumstances would demonstrate to be public (State ex rel. State Reclamation Board v. Clausen, 110 Wash. 540, 188 Pac. 538, 14 A. L. R. 1133), and would defeat it, not because such purpose was not a public one at the time it was submitted, but because it was not recognized as a public purpose at a previous time, when different conditions existed which were not such as then to permit of the presentation or consideration of the question whether such purpose was public or private, in the sense of the principle appellant invokes. Further, that rule would retain in the law, as appropriate for the expenditure of public money, purposes which, though once recognized as public, long since have passed from that category, by reason of changes in conditions."

We think existing conditions should be considered in ruling the question. The control, equipment and management of the mineral springs and wells is the declared purpose of the city. It seeks control of the properties that it may supervise sanitary conditions and the service in connection with the use of the waters. The improvement requires the construction of a lake, auditorium, lecture room, dams, flood protection systems, bath houses, therapeutic bath houses and

vending houses. It also requires the laying of pipes from the mineral wells to the drinking pavilion, bath houses, hotels and bottling works. In other words, the improvement requires a complete mineral water system and buildings for the use and entertainment of citizens and the general public.

It is admitted that a city may lawfully own and operate a light or water system, and that the construction and operation of either system is for a public purpose. The cities owning said systems are not held to be engaged in private business because they sell power, light and water. The sales are incidental to the service rendered the public. Certainly the purity of curative mineral waters used by the public and the control of the service in connection therewith are matters of public concern. If light and ordinary water systems are for a public purpose, the proposed mineral water system, including its equipment for service, is also for a public purpose. Furthermore, the law authorizing the improvement is a determination by the Legislature that the control, equipment and management of mineral springs and wells as provided therein is for a public purpose. The view of the Legislature should be given consideration. [Halbruegger v. City of St. Louis, supra.]

We think the proposed improvement is for a public purpose. In support of this ruling, attention is directed to cases as follows: Dysart v. City of St. Louis, 321 Mo. 514, 11 S. W. (2d) 1045; City of Wichita v. Clapp (Kan.), 263 Pac. 12; Smith v. Fuest (Kan.), 263 Pac. 1069; Water Supply Co. v. City of Albuquerque (N. M.), 128 Pac. 77; Eagan v. City of San Francisco (Cal.), 133 Pac. 294; City of Tampa v. Prince (Fla.), 58 So. 542; Cathcart v. City of Columbia (S. C.), 170 S. E. 435; Meyer v. City of Cleveland (Ohio), 171 N. E. 606; Willmon v. Powell (Cal.), 266 Pac. 1029; Mutual Oil Co. v. Zehrung, 11 Fed. (2d) 887; City of Mayfield v. Phipps (Ky.), 263 S. W. 37; West v. Town of Lake Placid (Fla.), 120 So. 361; Hackett v. City of Ottawa, 99 U. S. 86, l. c. 93; Burlington Twp. v. Beasley, 94 U. S. 310; Scotland Co. v. Thomas, 94 U. S. 682.

The auditor cites State v. O'Rear, 277 Mo. 303, 210 S. W. 392, and Kennedy v. City of Nevada, 281 S. W. 56. In the O'Rear case we ruled that absent a scarcity of ice affecting the public health, the city was not authorized to engage in the manufacture and sale of said commodity. In the Nevada case we ruled that the city was not authorized to engage in the hotel business for the accommodation of automobile transients passing through the country. The ruling on the question under consideration does not conflict with those cases. Furthermore, they involved the use of money derived from taxation.

II. He next contends that the sale of the bonds secured by the mortgage created a debt in excess of the indebtedness allowed in Section 12, Article X of the Constitution. The city admits the contention should be sustained if the bonds are a debt within the meaning of said section.

We have ruled that an indebtedness of a city to be paid only from income derived from the property purchased is not a debt within the meaning of said section of the Constitution. [State ex rel. v. Smith, 335 Mo. 825, 74 S. W. (2d) 367; State ex rel. City of Blue Springs v. McWilliams, 335 Mo. 816, 74 S. W. (2d) 363; Bell v. City of Fayette, 325 Mo. 75, 28 S. W. (2d) 356; State v. City of Neosho, 203' Mo. 40, 101 S. W. 99.]

In those cases there was no mortgage, whereas in this case the debt is secured by a mortgage on the properties. From this it is argued that property belonging to the city may be lost by foreclosure. We do not think so. In effect, the sale of bonds, purchase of property and execution of mortgage were simultaneous. Under the act of the Legislature the city has not and will not contribute property or expend money in aid of the improvement. The sale of the bonds, purchase of the lands and execution of the mortgage lodged in the city no beneficial interest in the properties covered by the mortgage. The city only holds the legal title to the properties, conditioned on acquiring, if ever, the beneficial interest by payment of the bonds from income derived from the properties. It follows the city could lose no property by a foreclosure of the mortgage. In this connection it is argued that "a debt is inherent in the nature of a mortgage." Even so, it may not be a debt within the meaning of Section 12, Article X of the Constitution. The sale of the bonds did not create a debt within the meaning of said section of the Constitution.

III. He next contends that all of the bonds sold in aid of the improvement are not secured by a first lien on the property as required by Section 6898b, in part as follows:

". . . which said mortgage or deeds of trust shall be a first lien on all said property and all revenues or income therefrom and shall be enforceable as provided therein but shall not be a debt of said city or payable out of any revenue not derived from said property."

The bonds sold to the Federal government are designated Series A, and the bonds sold on the market are designated Series B. The one mortgage covers both series of bonds. However, the mortgage gives Series A priority of payment. Therefore, it is argued that Series A bonds are a first lien, and Series B bonds are a second lien within the meaning of the statute. We do not think so. It is made clear by the above provision of the statute that the bonds can be paid only from

income derived from the properties covered by the mortgage. In other words, said properties are isolated as a first lien security for the payment of all the bonds. The statute does not indicate an intention on the part of the Legislature to prohibit the owners of different series of bonds from agreeing on priorities.

IV. He next contends that the city had no authority to sell a part of the parks.

As stated by the city, "the weight of authority is that a city has no implied power to sell a park and that express authority for this act must be found in the charter of the city before the city can make a valid conveyance of a park. Also, the weight of authority is that even if the city has express authority to sell and convey a park, still no valid conveyance can be made by the city unless it is the owner of the park in fee simple. To state this in another way, the weight of authority is that two elements must exist before the city can sell a park, to-wit, an absolute title and express power to sell. If the city has anything less than an absolute title, that is, merely holds the park in trust for the public, as in the case of a dedication, or if express power cannot be found in the charter of the city authorizing a sale, then a valid sale cannot be made." [3 McQuillin Mun. Corp. (2 Ed.), sec. 1243, p. 754.]

At this time a city of the third class only acquires possession of land condemned for parks. However, in 1912 and 1925 a city of said class acquired title in fee by condemnation. [Sec. 9271, R. S. 1909; Sec. 8344, R. S. 1919.] Thus it appears that the city acquired title in fee to Siloam and Regent Parks. It follows there is no right of reversion. But the auditor contends that the city was without authority to sell a part of the parks for the reason it held the title in trust for the public. We do not think so. At the time the land was condemned the city was expressly authorized by Section 6808, Revised Statutes 1929, to sell parks belonging to it. As between the city and the general public, the legislative power is supreme in the absence of special constitutional restriction. [3 Dillon Mun. Corp. (5 Ed.), sec. 1103, p. 1759.] And the statute authorizing the sale of parks did not violate any constitutional right of the owners of property in the vicinity or the owners of property assessed with benefits in the condemnation proceeding for park purposes. Under similar facts the question has been ruled as follows:

"The Legislature has the power to authorize the discontinuance of parks and the sale of park lands, the fee of which is in the city, and, when in so doing no private property is taken, such legislative authority to surrender or extinguish public rights cannot be questioned. [2 Smith's Leading Cases, 96; Riggs v. Board of Education, 27 Mich.

262; Brooklyn, etc., Commrs. v. Armstrong, 45 N. Y. 234, 6 Am. Rep. 70; Seattle Land, etc., Co. v. Seattle, 37 Wash. 274, 79 Pac. 780.] It is inevitable that a tract of ground once intended for and devoted to a particular public use may from the growth of the city and the changing of conditions become ill suited to such use. Public convenience, interests, and necessities may make a change of site imperative, and the people most concerned may be practically unanimous in demanding it, and to hold that the Legislature may not validly authorize an abandonment or sale of public grounds in any case would be to strip the state of one of the inherent and essential attributes of sovereignty. The owner of private property in the vicinity of such public square, whose means of ingress and egress is not destroyed or affected, has no vested right in the continued use of such property for public purposes. The loss, if any, sustained by such adjacent property owners by the abandonment or relocation of the public square, is not direct, but merely consequential, and is not with-' in the protection of the constitutional provision which forbids the taking of private property without compensation.'' [East Chicago Co. v. East Chicago, 171 Ind. 654, 87 N. E. 17, l. c. 20.]

It also has been ruled as follows:

''The fact that lands, including those now owned by respondents, were assessed for benefits, as directed by the Rock Creek Park Act, leads to no different conclusion. Respondents urge that the special benefits required to be assessed included those accruing from the perpetual maintenance of the park; that by virtue of the assessment they have paid for the right to. enjoy those benefits in perpetuity.

. . .

''We think that the benefits intended must be taken to be those obvious advantages which would accrue to lands in the vicinity of a park, because of their location, and which would be reflected in their market value, even though there were no guaranty that the park would be continued for any particular length of time.'' [Reichelderfer v. Quinn, 287 U. S. 315, l. c. 321, 322.]

To the same effect, Driscoll v. City of New Haven, 52 Atl. 618.

In this connection it should be stated that no question of taking private property for private use is presented by the record. The lands condemned were used for park purposes for many years. We think the city was authorized to sell the parts of the parks in question. Express authority having been given the city to sell parks, its motive in doing so cannot be questioned, in the absence of fraud. [State ex rel. v. Buder, 308 No. 237, l. c. 252, 271 S. W. 512; Tranter v. Allegheny County Authority (Pa.), 173 Atl. 289, l. c. 297; Windle v. City of Valparaiso, 113 N. E. 429, l. c. 433.] The auditor cites Heger v. City of St. Louis, 323 Mo. 1031, 20 S. W. (2d) 665. The

only question for determination in that case was the right of the city to lease land and dwellings acquired for extension of a park until plans could be formulated and funds procured for the improvement.

V. He next contends that the ordinance providing for the management and operation of the water system places the property beyond the control of the mayor and city council and is a delegation of legislative powers.

The statute authorized the mayor and council to do any and all things necessary to maintain and operate the project. [Sec. 6898a.] Of necessity they must do so through agents of the city. The ordinance provides for the absolute control and management of the properties by a water committee selected by the council. In other words, the agents in the regular departments of the city government have no control over the properties. Thus the self-liquidating project is isolated from the ordinary and usual affairs of the city. The ordinance consists of ten sections. It provides that the committee shall serve without remuneration and directs the appointment of a project manager and the procurement of "management-engineering service." It directs the committee as to every phase of the management. It directs that books of records and accounts be kept, and semi-annual reports made to the city as to the income, expenses and financial condition of the water system. It provides for audits of the books by the city; requires reasonable rates to be charged for the mineral water and provides free services for the poor. And it authorizes the council to remove members of the committee. Thus it appears that said committee is under the management and control of the mayor and city council. The duties of the committee are ministerial and the ordinance delegates no legislative powers.

The peremptory writ should be awarded. It is so ordered. All concur.