LLOYD, Appellant, *v.* CITY OF GREAT FALLS et al.,
RESPONDENTS.

(No. 7,907.)

(Submitted December 21, 1938. Decided December 31, 1938.)

[86 Pac. (2d) 395.]

*Mr. H. C. Hall* and *Mr. Edw. C. Alexander,* for Appellant, submitted a brief and a memorandum; *Mr. Hall* argued the cause orally.

*Mr. Julius J. Wuerthner, Mr. C. W. Murch, Mr. Paul J. Murphy* and *Mr. S. C. Ford,* for Respondents, submitted an original and a supplemental brief; *Mr. Wuerthner, Mr. Murphy* and *Mr. Ford* argued the cause orally.

*Mr. Sam D. Goza, Jr., Amicus Curiae,* argued the cause in behalf of the Cascade Trades and Labor Assembly of Great Falls, Montana.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This is an action by a taxpayer of Great Falls to enjoin the defendants from erecting a civic center, to house the offices of the city government on lands deeded to the city for park purposes. Judgment went for defendants, and plaintiff appealed.

The facts are, that on December 9, 1889, the Great Falls Water Power & Townsite Company donated certain lands to the city of Great Falls. The conveyance contained a clause that the lands are to be used by the city for public park purposes only, and restricted the right of the city to convey the same or any part thereof, or to use it for any other than a public park purpose. It provided for beautification of the lands, and contained a clause to the effect that upon failure of the city fully to comply with the terms and conditions of the grant, the conveyance shall become null and void and the lands shall revert to the donor, ''its successors and assigns.''

On December 8, 1909, the Great Northern Railway Company deeded lands to the city of Great Falls in exchange for other lands deeded by the city to it. The deed of the railway company to the city contained a clause to the effect that the lands were conveyed for the purpose of enabling the city to establish and maintain a public park or parks. It contained a clause that if the grantee failed to use the land for park purposes, the deed should become null and void, and the premises should revert to and re-vest in ''the grantor, its successors and assigns.''

The lands described in both deeds are located in what is now Margaret and Whittier Parks and have ever since been used and maintained by the city of Great Falls for park purposes. Between the two tracts of land there is another strip of land which has likewise been used for the same period of time for park purposes in conjunction with the two tracts embraced in the two deeds above mentioned.

The city now proposes to erect a civic center on the lands heretofore used as a public park. The building as proposed will rest upon part of the lands described in each deed above mentioned and upon the strip lying between the two. The city held an election on July 19, 1938, to determine whether it should issue bonds in the sum of $376,750 to defray 55 per cent. of the cost of the building, the Federal Emergency Administration of Public Works having given assurance that it would make a grant of sufficient money to defray the remaining 45 per cent. of the cost. A majority of the qualified electors voting on the proposition favored the bond issue. This action was then brought to restrain the construction of the building on the proposed site.

The complaint raises the question of the right of the city to use the lands involved for the proposed civic center, it being plaintiff's contention that the city is without right to use the lands involved in the deeds above referred to for any purpose other than park purposes, and that the residents and taxpayers of Great Falls have a vested right in the enjoyment and use of the lands for park purposes of which they cannot be divested without their consent.

The court made the following findings, among others:

"3. The defendants take the position, and there is some evidence to support the position so taken, that the city does not propose to undertake construction of the structure until such time as a deed or waiver has been obtained, covering the land in question. It is contended, and there is also evidence, that the original grantors of the land for park purposes have prom-

ised to deed or waive the restrictions contained in the deeds, so as to permit the city to construct the building.

"In the opinion of the court the grantors can release the conditions of the original deeds by executing a waiver, quitclaim deed or unconditional deed. Such waiver or deed would operate as an extinguishment of the original donor's right, and would operate to put an end to the reservation contained in the original grant, and under section 5039.5 R. C. M. of the State of Montana, the city could, if the city council so voted, vacate such land, or a portion thereof, for 'Park Purposes,' and there could be no question as to the right of the city to then construct the building now in contemplation.

"The court is, therefore, of the opinion that upon obtaining such deed or waiver, the land in question would thereafter belong to the park system without restriction or reservation, and the city could lawfully construct the building upon such land."

Counsel for plaintiff contend that even if the original grantors execute quitclaim deeds or waivers of the restrictions in the deeds, the city is without right to change the purpose for which the lands were dedicated by the grantors and used by the city. This presents the main question for consideration.

At the time the deed was made by the Great Falls Water Power & Townsite Company, the statute empowered the city council "to lay out, establish, open, alter, widen, extend, grade, pave or otherwise improve streets, alleys, avenues, sidewalks and public grounds, and vacate the same." (Sec. 325, subd. 10, Comp. Stat. 1887, 5th Div.) At the time the Great Northern Railway Company made its deed, the statute read the same, except the word "parks" had been inserted by amendment after the word "sidewalks." (Sec. 3259, subd. 6, Rev. Codes of 1907, now section 5039.5, Rev. Codes.) The words "public grounds" were broad enough to include "parks," and the amendment did not change the meaning of the statute as it existed theretofore. The amendment simply made plain that which was already embraced within the meaning of the statute before amendment. The deeds then were made with knowledge

on the part of the grantors and the general public that the city council had the authority to vacate the use of the land for park purposes. That was the obvious reason for the clause creating the possibility of a reverter. Had it been contemplated that the city could never vacate the use of the land for park purposes, there would have been no occasion for a clause providing for a reverter in that event.

May the city use the land for other than park purposes upon obtaining the consent of the owners of that reversionary interest? The applicable rule is stated by III McQuillan on Municipal Corporations, second edition, section 1243, as follows:

"Where lands have been dedicated and used for a public park or square, the municipal corporation holds the title in trust for the public and has no power, unless specially authorized by the legislature, to appropriate such lands for the use and benefit of private persons or corporations, sell the same, or in any way divert the land from the uses and purposes of its original dedication. * * *

"If land is conveyed to a city for a public park with a provision for a reversion in case it is used for any other purpose, the city cannot sell it, in the absence of express legislative authority on the subject; but where, at the time of the original transfer, there was a public statute authorizing a sale of a public park of any city on the petition of a majority of the legal voters, the money from such sale to be expended in the purchase of another park, the city can convey the land to the owner of the reversionary interest."

In the case of *East Chicago Co.* v. *City of East Chicago*, 171 Ind. 654, 87 N. E. 17, the court had under consideration this identical question under facts practically the same as here. It said: "The transfer of the park lot in controversy was made to the city with knowledge of the statutes quoted, and necessarily in subservience to the provisions thereof. The city was undoubtedly authorized to accept a title conditioned upon the continued use of the property in a particular way as well as one that purported to be absolute and irrevocable. The con-

veyance of this property to the city contemplated the possibility of the park being devoted to other uses, and provided for a reversion in that event. The legislature manifestly anticipated conditions which would make it expedient for a city to dispose of an existing public square or park and procure another, and provided for such contingency. The right to exercise such power was hedged and guarded by the requirement of a petition to the common council by a majority of the legal voters of the city. When thus petitioned, the authority of the common council to sell and convey a public square is complete and is broad enough to cover a fee-simple or such other title or interest as the city may have acquired in such property.''

In speaking on this question under similar facts, the supreme court of Michigan, in *City of Detroit* v. *Judge of Recorder's Court*, 253 Mich. 6, 234 N. W. 445, said: ''At the time of the dedication, the city of Detroit was operating under the provisions of a charter (Act No. 326 of the Local Acts of Michigan for 1883), section 33 c. 7, of which (as amended by Act No. 544 of the Local Acts of 1887) also provided that the common council might 'alter, vacate and abolish * * * public grounds or spaces within said city.' The reservation in the dedication by the grantors in which they provided for the contingency of the abandonment of the ornamental strip or park did not of itself empower the city to abandon it at will. (*Douglass* v. *Montgomery*, 118 Ala. 599, 24 So. 745, 43 L. R. A. 376.) Nevertheless, when considered in connection with the power which, under the charter at the time of the dedication, the council had to alter, vacate, or abolish public grounds, it must be presumed that the dedication was subject to the city's right to abandon the strip. There was no waiver of such right when the city accepted the plat and dedication.'' The court in that case, which was a condemnation proceeding, stated that the rights of three parties were involved—the city, the owners of the reversion and the abutting owners. It said: ''The city would have a right to alter or change this ornamental strip into

a street had it the consent of the owners of the reversion and the abutting property owners which it is attempting to secure in the present proceedings.'' Here the waiver by the owners of the reversion leaves but two parties to consider—the city and the abutting owners or general public.

An abutting owner or one who constructs buildings on the strength of the continued use of the property for park purposes and the public generally has no vested right which the legislature cannot disturb by authorizing an abandonment of the property for park purposes, particularly where the legislation existed at the time the property was acquired for park purposes. (*Brooklyn Park Commrs.* v. *Armstrong*, 45 N'. Y. 234, 6 Am. Rep. 70; *Riggs* v. *Board of Education*, 27 Mich. 262; *Reichelderfer* v. *Quinn*, 287 U. S. 315, 53 Sup. Ct. 177, 77 L. Ed. 331, 83 A. L. R. 1429; *East Chicago Co.* v. *City of East Chicago*, supra. And compare *State* v. *Hoblitt*, 87 Mont. 403, 288 Pac. 181; *Spinks* v. *City of Los Angeles*, 220 Cal. 366, 31 Pac. (2d) 193; *State ex rel. City of Excelsior Springs* v. *Smith*, 336 Mo. 1104, 82 S. W. (2d) 37.)

It is noteworthy that in *McIntyre* v. *Board of Commrs.*, 15 Colo. App. 78, 61 Pac. 237, the court reached a different conclusion from ours, but did so only because the statute similar to our present section 5039.5 did not exist at the time of the grant. The same was true in *Carstens* v. *City of Wood River*, 332 Ill. 400, 163 N. E. 816, 63 A. L. R. 471. Here, as pointed out above, our statute authorizing the city council to vacate a park existed when the grants were made. There are other cases relied upon by plaintiff which are in seeming conflict with our views, but upon examination they are seen to be distinguishable.

Thus, *Spinks* v. *City of Los Angeles*, 220 Cal. 366, 31 Pac. (2d) 193, seems at variance with what we have said, but it will be noted that the city's charter there involved provided in substance that all lands dedicated for park purposes regardless of the time of dedication should ''forever remain to the use of the public inviolate.''

By a divided court, the case of *Douglass* v. *City Council of Montgomery*, 118 Ala. 599, 24 So. 745, 43 L. R. A. 376, reached a different conclusion from what we do, but it does not appear that in that state there was a statute authorizing cities to vacate parks at the time of the dedication, such as we had and have in this state. The same is true of *Streuber* v. *Alton*, 319 Ill. 43, 149 N. E. 577, 41 A. L. R. 1405.

The case of *Slavich* v. *Hamilton*, 201 Cal. 299, 257 Pac. 60, also reaches a different conclusion, but there, too, it does not appear that there was any statute such as our section 5039.5. The court was careful to point out that the city in that case "had the power to irrevocably dedicate" the property for park purposes which the court found it had done.

Reaching the conclusion we do, then before the city could vacate the park under the facts here, the rights of the owners of the reversion must be given consideration. If, however, the owners of the reversion waive their rights they could not be heard to complain.

Counsel for plaintiff contend that sections 5043 and 5044, Revised Codes, contemplate that lands acquired by the city by gift or donation must be used by the city for the particular purpose for which the same was given or donated. Those statutes were not in existence when the deeds here under consideration were made, and do not for that reason apply to the situation here being considered.

The deeds by the Great Falls Water Power & Townsite Company and the Great Northern Railway Company vested the title in the city with a possibility of reverter in case the city ceases to use the property for park purposes. If the original grantors, or their successors, execute a quitclaim deed or a waiver of their rights to a reversion, as is proposed, then the city will own the fee without any possibility of reversion, and the city may use the property as it sees fit.

We are aware that courts have often differentiated between park lands purchased and publicly dedicated, and those dedicated by private conveyance. In view of our statute authorizing the city to vacate public grounds existing at the time of

the private conveyances here in question, the reason for that distinction does not apply here.

Whether section 5043, adopted in 1917, has made a change with reference to private dedications made after that time is not now before us. The rule is well established that the city may vacate public grounds publicly dedicated for park and other purposes.

In *Brooklyn Park Commrs.* v. *Armstrong,* supra, the court said: "It is to be observed that the Act of 1861 vested the lands in the city of Brooklyn forever, but for the uses and purposes in that Act mentioned. Though the city took the title to the lands by this provision, it took it for the public use as a park, and held it in trust for that purpose. Of course, taking the title, had it taken it also free from such trust, it could have sold and conveyed it away, when and as it chose. Receiving the title in trust for an especial public use, it could not convey without the sanction of the legislature; and the Act of 1870 expresses the legislative sanction. Under its provisions (Laws of 1870, chap. 373, p. 848), it is authorized to sell and convey, with covenants, certain portions of the land taken (sec. 1), of which the premises in question in this case are a part. It was within the power of the legislature to relieve the city from the trust to hold it for a use only, and to authorize it to sell and convey. (*Nicoll* v. *New York & Erie R. R.,* [12 N. Y. 121] 2 Kern. 121.)"

In that case the lands were acquired by condemnation proceedings, but under a statute authorizing such proceedings for a public park only. We see no valid distinction between a case where the city buys property for a public park and where it takes property by donation, particularly where, as proposed here, the donor or its successors, acknowledge the right in the city to use the property for other than park purposes.

In the last cited case the court also said: "The legislature could discharge it [the city] from the trust to hold them for a park, and empower it to sell. It has done so, and, so far as any express limitation in our state Constitution is concerned,

452

it had the power to do so." So the legislature in this state has authorized the city council to vacate parks (sec. 5039.5, Rev. Codes), and this being true, at the time the dedication was made the public took its rights subject to the power of the city council to vacate the same.

By procuring waivers from the owners of the reversionary interest, the case will stand as if the deeds contained no reverter clause. In such a situation, the city is free to use the property for other than park purposes. (*Briggs* v. *City of Grand Rapids*, 261 Mich. 11, 245 N. W. 555.)

In *Sharp* v. *City of Guthrie*, 49 Okl. 213, 152 Pac. 403, Congress granted lands to be entered as townsites upon compliance with Congressional Acts. A deed to such lands was executed to the city of Guthrie containing this provision: "To have and to hold, and maintain, the same for the sole and separate use and benefit and purpose of a public park for public uses and none other." This deed was executed in 1894. It was later discovered that the deed was ineffectual to convey title, and in 1913 patent was issued by the President without any restriction as to the use to be made of the property. The same contention was there made as that here. The court said: "In the instant case there was not a donation or dedication within the rule of any of the decisions relied upon. There was no special assessment upon adjoining property to pay for the lands in controversy, or to improve the same, and the title in fee simple having been conveyed to the city for value, without restriction or condition, there was nothing to prevent it from changing the contemplated use thereof, if otherwise properly authorized by law. (*Wright* v. *Morgan* [191 U. S. 55, 24 Sup. Ct. 6, 48 L. Ed. 89], supra; *Morgan* v. *Rogers* [8 Cir., 79 Fed. 577], supra; *Seattle Land & Imp. Co.* v. *Seattle* [37 Wash. 274, 79 Pac. 780], supra; *Owen* v. *Tulsa* [27 Okl. 264, 111 Pac. 320], supra.) The provision in the patent issued by the trustees on July 31, 1894, cannot operate to impress a trust upon the lands, nor annex a condition to the grant, for the reason that the same was recalled and canceled."

So here, the restrictions placed in the deeds by the original grantors will be removed by the waiver proposed to be obtained, and the city will be free to use the property as it sees fit, under section 5039.5, supra. In the *Sharp Case*, supra, the court further said: "The property in question having been purchased and paid for, and patent executed conveying the title to the city in fee simple without condition or restriction, and the purchase price not having been raised by virtue of any special assessment upon abutting property, and plaintiff's property not having been burdened or incumbered with any assessment for the improvement thereof, other than that imposed generally upon the property of others within the city, the right of the city to sell the property is established, if it had authority under its charter so to do."

The supreme court of Missouri, in *State ex rel. City of Excelsior Springs* v. *Smith*, 336 Mo. 1104, 82 S. W. (2d) 37, had this to say: "Thus, it appears that the city acquired title in fee to Siloam and Regent Parks. It follows there is no right of reversion. But the auditor contends that the city was without authority to sell a part of the parks for the reason it held the title in trust for the public. We do not think so. At the time the land was condemned, the city was expressly authorized by section 6808, R. S. 1929 (Mo. St. Ann., sec. 6808, p. 5620) to sell parks belonging to it. As between the city and the general public, the legislative power is supreme in the absence of special constitutional restriction. (Dillon Mun. Corp. (5th Ed.), vol. III, sec. 1103, p. 1759.) And the statute authorizing the sale of parks did not violate any constitutional right of the owners of property in the vicinity or the owners of property assessed with benefits in the condemnation proceeding for park purposes. Under similar facts, the question has been ruled as follows: 'The legislature has the power to authorize the discontinuance of parks and the sale of park lands, the fee of which is in the city, and, when in so doing no private property is taken, such legislative authority to surrender or extinguish public rights cannot be questioned. (2 Smith's Leading Cases, 96; *Riggs* v. *Board of Education*, 27 Mich. 262; *Brooklyn Park*

454

*Com'rs* v. *Armstrong*, 45 N. Y. 234, 6 Am. Rep. 70; *Seattle Land, etc., Co.* v. *Seattle*, 37 Wash. 274, 79 Pac. 780.) It is inevitable that a tract of ground once intended for and devoted to a particular public use may from the growth of the city and the changing of conditions become ill suited to such use. Public convenience, interest, and necessities may make a change of site imperative, and the people most concerned may be practically unanimous in demanding it, and to hold that the legislature may not validly authorize an abandonment or sale of public grounds in any case would be to strip the state of one of the inherent and essential attributes of sovereignty. The owner of property in the vicinity of such public square, whose means of ingress and egress is not destroyed or affected, has no vested right in the continued use of such property for public purposes. The loss, if any, sustained by such adjacent property owners by the abandonment or relocation of the public square, is not direct, but merely consequential, and is not within the protection of the constitutional provision which forbids the taking of private property without compensation.' (*East Chicago Co.* v. *East Chicago*, 171 Ind. 654, 87 N. E. 17, loc. cit. 20.)''

The only remaining question is whether the ballot was sufficiently specific to advise the voters what they were voting on. The ballot was in the following form:

''Shall the city of Great Falls, Montana, be authorized and empowered, by and through its duly authorized officers, to issue general obligations, bonds or debentures, pledging the credit of said city to the extent of $376,750.00 to defray, pay and liquidate 55% of the cost of erecting a civic center, to house the offices of the city government, the proceeds of said bonds to be used only when used in cooperation with other funds advanced for such purposes by the United States of America; said bonds and debentures to bear interest not to exceed 4% payable semi-annually as amortization bonds as first choice and serial bonds as second choice and to be paid over a period of 20 years.

☐ For Bonds Civic Center.
☐ Against Bonds Civic Center.''

Plaintiff contends that since it now appears that defendants propose to erect a building containing an auditorium, a stadium, hockey rink, banquet hall, shooting gallery, veterans' memorial hall, and an art gallery, as well as offices for the city government, the ballot was not sufficient in describing the purpose of the proposed bond issue.

The city council, before holding the election, passed a resolution calling the election, in which it recited that there was need of a civic center to provide for conventions and other large public gatherings, together with facilities for cultural and recreational activities, and that it was the plan of the city council to erect a civic center building to house the offices of the city officials and to provide for an auditorium suitable for conventions, cultural and recreational activities. This resolution was a matter of public record and open to the inspection by the public interested in the question. Copies of the resolution were posted in three public places in each voting precinct at least 20 days before the election. The court found: "The testimony further shows that a joint committee from the Chamber of Commerce, Trades and Labor Assembly and the City Council of the City of Great Falls held numerous public meetings to discuss the proposed bond issue, as outlined by the resolution, heretofore referred to, and that there was a great deal of publicity given the proposed bond issue."

The details of the proposed work need not appear on the ballot, so long as the resolution calling the election contains full details, as here. (*Clark* v. *Los Angeles,* 160 Cal. 317, 116 Pac. 966.) We hold that the ballot was sufficiently definite to advise the voters of the intended purpose of the bond issue. Voters desiring additional information as to details had the means at hand for ascertaining it.

The court in its conclusions found: "Since it appears to the court that the defendants do not threaten or intend to construct said building upon said premises until such time as title thereto has been obtained, or until the restrictions contained in said deeds have been removed by proper waiver or deed, it is the opinion of the court that plaintiff is not entitled to injunctive

relief.'' Counsel for the city at the argument of this cause expressed a willingness to be enjoined until the waivers are obtained.

The cause is remanded with direction to modify the judgment accordingly, and as thus modified it will stand affirmed.

MR. JUSTICE STEWART concurs.

MR. CHIEF JUSTICE JOHNSON:

I concur. My concurrence in that part of the foregoing opinion to the effect that the city may use for the purpose therein indicated portions of Whittier and Margaret Parks deeded to the city by the Great Northern Railway Company and the Great Falls Water Power & Townsite Company, if the consent of these grantors or their successors in interest can be obtained, is based entirely upon the condition of the statutory law of Montana when those deeds were executed. At those times the statutes provided, without any limitation or qualification, that public grounds might be vacated by city councils. But for that provision, the general public would probably, under the majority line of decisions, have received such permanent park rights, at least in the donated land, that neither the original grantor, its successors or assigns, on the one hand, nor the general public, on the other hand, down to the remotest times, could have divested them except, perhaps, by the power of eminent domain. Even though by reason of changing conditions, the land in question should become utterly worthless for park purposes, or worth more to every interested party for other purposes, or though the city became unable financially to maintain it for park purposes, or even became a ghost town, there might be no remedy for an impossible situation.

Manifestly it was the purpose of the legislature to prevent this irrevocable and eternal limitation of certain land to a particular purpose regardless of changing conditions, and the words used were admirably adapted to the end. The legislature could, if it desired, have limited this right of vacating public grounds to land dedicated by the public, rather than by an individual;

but it failed to do so, probably because there is no more sense in perpetuating a futile or useless situation in one instance than in the other. Certainly, the matter was one of public policy, and upon it the legislature has spoken.

In the dissenting opinion it is said: "It is fundamental that parties may contract waiving their statutory rights unless prohibited by public policy." The argument is that the authority to vacate the park was a mere right in the city council, which the latter could waive, and did in fact waive, by accepting the deeds in question. But that authority was not the personal right of the city council as then constituted, or of the city as an entity, which either might waive for all time; it was merely a public power entrusted to the city council for the benefit of the general public, and the council could no more waive it with reference to a private dedication, than it could with reference to a public one.

I know of no principle of constitutional law under which official powers can be waived by private contracts, either as to the official body as then constituted, or as to that body in perpetuity, however constituted. But if there were a mere statutory right, rather than an official power, it could still not be waived, because such waiver would be clearly against public policy, as expressed by the legislature. In the words of the dissenting opinion: "The utterances of the legislature are the declaration of the policy of the state." (Citing a Montana case.)

The question is not whether the city council can use the land for other than park purposes; the question is merely whether it can vacate the park. Its use of the land for other purposes will then depend entirely upon further authority from the original grantors or their successors in interest, as set forth in the decision of the court below.

The dissenting opinion regards the making, giving and acceptance of each of the deeds as a contract that the statutory power to vacate the park will never be exerted. I can accept that theory, neither upon the law as outlined above, nor upon the facts.

Nor can I agree that the enforcement of the statute, which existed when the deeds were made, constitutes any breach of trust. The deeds were made with knowledge of the law; they were accepted by the city with knowledge of the law; the public acquired its rights under them with knowledge of the law. Under the statute both the donors and the city were powerless to thwart the legislative grant of power to the public, exercised through the city council, to vacate parks or other public grounds if it thought best; and the trust was necessarily subject to that statutory provision.

MR. JUSTICE ANDERSON.

I dissent. The rule is recognized throughout judicial decisions thus far, that where a private dedication of real property is made to a city or municipality for a park, or a similar public purpose, it may not be used for any purpose which is inconsistent with the intention expressed in the dedication. The cases adhering to this rule are collected in 18 A. L. R. 1247, and *City of Wichita* v. *Clapp*, 125 Kan. 100, 263 Pac. 12, 63 A. L. R. 484. All agree that where the dedication is public, there may be a change in the purpose for which the property is used.

Where the title to land has been dedicated to a public use, as for a highway or public square in a city, the title is in the city as trustee for the public. (*Werlein* v. *New Orleans,* 177 U. S. 390, 20 Sup. Ct. 682, 44 L. Ed. 817.) The trust created by such dedication may not be destroyed by the subsequent act of him who created it, or his successors in interest. (*Commissioners of Franklin County* v. *Lathrop,* 9 Kan. 453.)

But all these fundamental rules which have been recognized are set at naught by the majority opinion in this case, upon the theory that when the grants were made to the city they were made subject to the provisions of the statute authorizing the city council to vacate parks, and, therefore, the donor was incapable of making a conveyance which would assure the continuance of the use of the property contrary to the whim or caprice of succeeding city councils.

The conveyances were made upon the express condition that the property in question should be used for park purposes. A trust was thereby created in favor of the public, which the legislature, as I view it, was unable, either by antecedent or subsequent act, to thwart the expressed intention of the parties to these grants. In other words, the effect of the majority opinion is to say that the expressed intention of the donors as to the use to which this property was to be devoted, is about as effective and binding as the ordinary well-intentioned New Year's resolution. Instead of upholding the validity of a solemn contract and enforcing the validity of a trust created by such contract, a statute—the provisions of which might be waived— is used as the engine of destruction to set aside the contract and destroy the trust created thereby.

Contracts may be entered into which are not against public policy—which is that principle of law holding that no citizen can lawfully do that which has a tendency to be injurious to the public or against good morals. The utterances of the legislature are the declaration of the policy of the state. (*State v. Gateway Mortuaries,* 87 Mont. 225, 287 Pac. 156, 68 A. L. R. 1512.)

The statute on which the majority opinion rests does not declare a contract such as the one before us void. It is fundamental that parties may contract waiving their statutory rights unless prohibited by public policy. This statute does not prohibit the making of the contract which was made in this case by the grantors and its acceptance by the city. In this case, and all others of similar nature hereafter arising the successors of the grantor or donor by consenting to a change in use and the subsequent conduct of the city, which holds the property in trust, changing the use leads inevitably to the truth of the prophecy in *Warren* v. *Mayor of the City of Lyons,* 22 Iowa, 351, wherein it was said: "And why, we ask, is not the like rule applicable, and the like good faith required, as between a corporation, representing the public, and an individual? Why may I not affix the terms, designate the uses and purposes, upon and for which I give to the public, my farm, or my lots? And

upon what principle of law or morals is it, that. the legislature can say that this property may, at the option of the trustees, be used for another and different purpose? 'A' dedicates his grounds for school purposes, for instance. The corporation, deeming some other place better suited to the object indicated, turns the dedicated property over to fishmongers, and tallow-chandlers, or, if you please, to merchant princes, and wealthy householders, defiantly saying, 'You no longer have any interest in this property, but we can misuse the same without limit, and you cannot complain.' Such a doctrine would enable the state at pleasure to trifle with the rights of individuals, and we can scarcely conceive of a doctrine which would more effectively check every disposition to give for public or charitable purposes.''

Clearly, the city may not lawfully breach the trust created by these grants, and the trial court should have granted the injunction as prayed.

MR. JUSTICE MORRIS:

I concur in the above dissent by MR. JUSTICE ANDERSON.

Rehearing denied January 24, 1939.