GOTTLIEB-KNABE & COMPANY et al. *vs.* CHARLES F. MACKLIN et al.

*Right of Municipality to Rent Property Not Needed for Public Use—Use of Rented Municipal Property in Competition With Business of Taxpayer.*

When a municipality owns real property not needed for public use, it is not obliged to keep the same unoccupied, but may rent it temporarily to private persons. The fact that a lessee uses such property in competition with the business of a taxpayer, does not entitle the latter to an injunction, when the renting is not *ultra vires.*

The Mayor and City Council of Baltimore rented an unused building owned by it to the Field Officers of a regiment of State Militia for use as an armory for a definite term. These officers, with the consent of the municipality, sublet the building from time to time to private persons for concerts and other meetings. The proceeds from these lettings were divided between the municipality and the regiment. The charter of the city authorizes it to hold and dispose of property, and to rent for limited terms, any of its property not needed for public purposes. Plaintiffs' bill in this case alleged that they are the owners of halls, used for concerts and public meetings; that the renting of the armory by the Field Officers for such purposes deprived plaintiffs of the opportunity to rent their buildings for those purposes, and that such use of the municipal property was unlawful, and the bill prayed for an injunction. *Held,* that the city has the power under its charter to rent the building to the Field Officers, since it was not needed for municipal purposes; that the letting of it for entertanments was a renting for a definite term within the meaning of the charter, and that the Field Officers as lessees had the right to sublet the building for these purposes.

*Held,* further, that such use of the armory in competition with the business of plaintiff does not deprive them of their property without due process of law.

*Decided January 13th, 1909.*

Appeal from the Circuit Court of Baltimore City (EL-LIOTT, J.)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS, WORTHINGTON and HENRY, JJ.

*William L. Marbury* and *Carroll T. Bond,* for the appellants.

*Albert S. Gill* and *John Philip Hill,* for the appellees.

PEARCE, J., delivered the opinion of the Court.

The Mayor and City Council of Baltimore owns a lot of ground on Fayette Street in said city, improved by a building constructed and used for a number of years, as the Western Female High School of said city, but in 1896 its use for this purpose was abandoned, and during the same year the Mayor and City Council, through its then Comptroller, Charles D. Fenhagen, acting under Ordinance No. 155 of said Mayor and City Council, leased said lot and building to certain persons then constituting the Field Officers of the Fourth Regiment Infantry, Maryland National Guard, and their successors in office, "for the purpose of an armory for said regiment, for the term of five years, from March 11th, 1896, for the sum of one dollar per annum rent," and in further consideration of the performance of certain covenants contained in said lease, as to which covenants no question arises. The successors of the Field Officers named in said lease are the defendants in this case, the present Field Officers, other than the Mayor and City Council, and are lessees holding over under said lease.

The plaintiffs, Gottlieb-Knabe Company of Baltimore City,

and Germania Mænnerchor of Baltimore City, are both private corporations under the laws of Maryland, owning and maintaining buildings rented by them for profit, for concerts, exhibitions, entertainments and public meetings; are both substantial taxpayers in said city, the first-named plaintiff being the owner of the building on Mount Royal Avenue known as "The Lyric," and the latter being the owner of a large building and hall on West Lombard Street, in said city, both of which buildings have been long used for the above-mentioned purposes. The bill charges that the "present Field Officers by and with the consent and concurrence of the Mayor and City Council, for the purpose of providing money for the said Fourth Regiment, in addition to that appropriated by the State, in maintaining that branch of the militia, and for adding to the revenues of the city, have entered into contracts for the rental of said armory building for concerts, meetings and other gatherings by organizations of private citizens desiring such use of said building, and have heretofore actually rented said building for said purposes, and have entered into contracts for still further rentals of that character, in the months of October, November and December, 1907, and January, 1908, under an agreement that part of said rentals shall be paid to said Field Officers, and part to the Mayor and City Council."

The bill further charges that still other contracts of like character are being sought by other organizations, none of which have any connection with any branch of the State Militia, or with the municipality of Baltimore, but are exclusively devoted to private purposes, and intend to devote said armory, when so rented to them, exclusively to concerts, entertainments, etc., for the private profit of said organizations.

The bill further charges that such use of said armory is an unauthorized and unlawful use of the property of the taxpayers, and endangers the said property and the equipment and personal property of the State for which said building is provided as a storehouse; that such rentals for such private purposes deprive the plaintiffs and others owning like prop-

erty of opportunity to rent their buildings for similar pur-
poses and of deriving from them income which would other-
wise be assured, and if allowed will deprive the plaintiffs
of profitable customers of long standing—one of which, "The
Harmonie Singing Society," is now advertising numerous
entertainments to be held in said armory; that it is impossi-
ble for plaintiffs and others in like situation to enter into
competition with said defendants, they being exempt from all
taxes and cost of maintenance, while plaintiffs are not only
subjected to these charges upon their properties, but are com-
pelled as taxpayers to bear their proportion of what is de-
voted to the maintenance of said armory; that protest against
this alleged injustice has been made to the Governor of
the State, by whom said protest was referred to the Adjutant-
General of the State, who has replied that he is without power
to act in the premises.

The prayer of the bill is for an injunction restraining the
defendants, their agents and officers, and their successors in
office, from letting or renting the said armory, or any part
thereof, for the use of meetings, concerts, exhibitions or en-
tertainments, to any person or persons, organization or organ-
izations, other than the officers or organizations of the Militia
of the State of Maryland, and for such other and further re-
lief as their case may require.

A preliminary injunction was issued, and both defendants
demurred to the bill on the ground that no case was stated
therein entitling either plaintiff to relief in equity, and on
the hearing the demurrer was sustained, the injunction was
dissolved and the bill of complaint dismissed.

This case has been argued by all the counsel with much
ability, and by the distinguished counsel for the appellants
with unusual fullness and earnestness.   If the matter could
be reduced to a question of *public policy* properly determina-
ble by this Court, our conclusion might, perhaps, be differ-
ent, though we are not to be understood as so stating.   The
inquiry, however, is one of *power,* and it is not claimed that

the renting complained of can be restrained unless the act is *ultra vires.*

After a careful examination and consideration of the briefs in the case we think the questions necessary for determination may be reduced to two:

1st. Had the city the right to rent this building as it did?

2nd. If it had such right, what is there, if anything, in the character of the Field Officers, as lessees, to affect their power of subletting *in the manner,* and *for the purposes, which they have been, and are, doing?*

1st—By section 1, of Article 4, Public Local Laws—City Code—the Mayor and City Council are expressly authorized "to purchase and hold real, personal and mixed property, and *dispose* of the same for the benefit of the city as hereinafter provided."

By section 13 of the same Article it is declared: "Nothing contained in this Article shall prevent the Mayor and City Council of Baltimore from disposing of any building or parcel of land no longer needed for public use; provided that such disposition shall be approved of by the Finance Commissioners by their uniting in the conveyance thereof, and shall be made at public sale and be provided for by ordinance; nor from the renting for fixed and limited terms of any of its property not needed for public purposes, on approval of the Commissioners of Finance."

Under this section, absolute disposal must be provided for by ordinance, and must be at public sale, and the Finance Commissioners must unite in the conveyance as the evidence of their approval. There is no limitation upon the power of renting for fixed and limited terms, except the approval of the Finance Commissioners, the mode of approval not being specified. The lease to the Field Officers in this case, however, recites the fact that it was made in pursuance of Ordinance No. 155 of the Mayor and City Council, *approved* May 12th, 1893, so that it appears to have been made in accord with the strictest construction of section 13 of Article 4.

In *Davidson* v. *Mayor and City Council,* 96 Md. 509,

under an ordinance of the Mayor and City Council of Balti-
more, a lot was acquired and a building erected thereon for
the use of English-German School No. 1, and it was so used
for a number of years, when the Board of School Commis-
sioners of the City determined to use it for a colored high
school, which change of use certain taxpayers of the city
sought to restrain by injunction. In refusing the injunction
on appeal this Court referring to section 1 of the City Char-
ter, *supra,* said: "By the first and second sections of that
instrument all the property of the city is vested in them with
full power of disposition of it in the manner and terms there-
in provided. Under the lease the Mayor and City Council
became the owner of the premises, and by reason thereof had
full power to designate from time to time the uses to which
it could be put. * * * The terms of the charter, and the
Acts of Assembly, if there were any, determine what should
be the measure of their power and duty. * * * It could
not have been intended that for all time the premises could be
used only for the uses of that school. If it could be available
for no other use than that specifically mentioned, it could well
happen that after the location had ceased to be available for
the specified use, and there was no power in the corporation
to designate any other employment of the premises, the prop-
erty would remain idle and worthless, and become a mere
incumbrance on the city." This case is cited to show the
broad and emphatic language used in considering the power
of the city to determine the uses to which its property of that
description can be put, though the case did not involve the
precise questions here presented, of property no longer needed
for public uses. But, as we shall see later, there are abundant
authorities from other Courts of high repute sustaining the
lease to the Field Officers in this case.

We have not overlooked, though we cannot agree with the
ingenious argument of the appellants, by which they seek
to take this case out of the operation of section 13 of the
Charter. They contend that "letting" for entertainments
for one or more evenings, however definitely ascertained, is

not a "renting for a fixed and limited term." We think it is
apparent that the meaning and purpose of the requirement
that the renting allowed should be for a fixed and limited
term—and with the approval of the Finance Commission-
ers—was that no such indefinite or renewable contracts should
be made as would interfere with the probability of an early
*absolute* disposal of unused property of the city, no argument
being required to show that when real property, or buildings
belonging to the city are no longer available for its public
uses, the financial interests of the city demand that the cost
of maintenance be gotten rid of as promptly as possible by
absolute sale; and we are of opinion that the term "renting"
as here used embraces the power to let or hire the use for
a single evening or any number of evenings—whether con-
secutive or not. A liberal construction of such a charter
power is required to enable the city, in the interest of its
general taxpayers, to minimize the loss of revenue upon its
unused property.

Again the appellants contend that this building is not
"property not needed for public use," as those words are
used in section 13, because it is as they say, "in the custody
and regular use of a branch of the government as its only
habitation." But why is it in such use and custody? Clearly
only because the city *its owner* does not need it for any of its
*own public uses.* Can it be supposed that if the city could
adapt it to any substantial and valuable public use of the
municipality, it would so recklessly neglect its duty to the
taxpayers as to rent it to the Field Officers as they did for
one dollar a year and a covenant to maintain an insurance
for $10,000? The question answers itself, and must satisfy
anyone who will consider it impartially, that it is *now,* not-
withstanding its occupancy under the terms of this lease, as
clearly unused property so far as the city is concerned, as it
was before this lease was made.

Referring now to the authorities which we have said are
abundant to sustain this lease, we cite the following:

In *French* v. *Quincy,* 3 Allen. 9, the town erected a town

hall on a lot held under a deed conveying the title for that specific use, with condition for reverter to the grantor or his heirs on breach of condition as to use. The building was so constructed as to contain in the first story a bank, a clothing store, and a lockup, and in the second story a hall for town meetings, also used as a theatre and for entertainments and dances. Upon a writ of re-entry, it was held that the town having authority to construct the building, and not having occasion to use parts of it for the time being, is not obliged to keep them unoccupied but may derive a revenue from them by renting them—notwithstanding this interfered with the business of the plaintiff's tavern.

In *Bates* v. *Bassett,* 60 Vermont, 531, the town owed an old hall not used or needed for any town purposes. Being dilapidated, it was repaired at a cost of $2,500, and the apartments rented for various purposes. The Court said: "The town had no right, *as a primary purpose* to erect a building to rent, but if in the erection of a hall for its proper municipal purposes, it conceives that it will lighten its burdens to rent part of its building whereby an income is gained, no sound reason is suggested why it may not do so."

In *Stone* v. *Ocomowoc,* 71 Wis. 155, plaintiff, who was a large taxpayer and owned a hall in the city used for lectures, theatrical performances, dances, etc., sought to restrain the city from leasing its auditorium for the same purposes. The Charter gave the city power to purchase and hold for use of the city any estate, real or personal, and to sell, lease and convey the same, and to control and manage any other property of the city. The relief was refused, the Court holding the injury to the plaintiff to be too remote and consequential to be the basis of an action, and hence *damnum absque injuria.*

In *Bell* v. *Plattville,* 71 Wis. 139, where a similar question was decided in the same way, the Court quoted with approval the language of LORD CHANCELLOR SELBORNE in *Attorney-General* v. *Great East. R. W. Co.,* L. R. 5 App. Cases, 473, in which he said: "The doctrine of *ultra vires*

ought to be reasonably and not unreasonably understood and applied, and that whatever may be fairly regarded as incidental to, or consequential upon those things which the Legislature has authorized, ought not, unless expressly prohibited, to be held by judicial construction to be *ultra vires.*" And in the same case the Wisconsin Court took occasion to say (referring to the cases of school districts so much relied on by the appellants in the case now before us) : "The cases relating to powers of school districts cannot be regarded as an authority for limiting the powers of cities as claimed, since their powers are very much more restricted, being at most *quasi* corporations—or corporations *sub modo* only." The same view has been held in the Federal Court, in *The Maggie P.,* 25 Fed. Rep. 203. In that case the city of St. Louis, through its harbor master pumped out a sunken steamer, under a contract with the owner, and filed a libel for these services. The vessel owner raised the question whether the making of such a contract by the city was not outside the scope of municipal power. The Court through Mr. Justice Brewer sustained the libel, after careful consideration, saying: "When a city has in its possession instrumentalities, and hires employees for the purpose of discharging some public duty, I see no reason why, when the exigencies of public duties do not require the use of those instrumentalities and employees, it may not make a valid contract to use them in some private service." This is the exact principle announced by Judge Bartol in *Rittenhouse* v. *Balto.,* 25 Md. 336, in which he says: "Where the corporation appears in the character of a mere property holder, and enters into a contract with reference to such property, as any private citizen or other proprietor might do, or where it engages in an enterprise, not necessarily connected with, or growing out of its public capacity, as a part of the local government, then all its rights and liabilities are to be measured and determined by the same rules as govern mere individual persons or private corporations." The Court, also in the same case, laid down the doctrine repeated and emphasized in *St. Mary's Indus. School*

v. *Brown,* 45 Md. 326, and *Davidson* v. *Baltimore City,* 96 Md. 513, that the taxpayer cannot invoke the restraining power of a Court of Equity, unless it be shown that the municipal corporation and its officers are acting *ultra vires,* and where such unauthorized acts may affect injuriously the rights and property of the parties complaining. Many other cases to like effect might be cited, but they may be found collected in 20 *Enc. Law,* 2nd Ed., 1187 and notes.

Before passing from this branch of the case we will refer briefly to three cases principally relied on by the appellants in opposition to the views we have expressed and the cases we have cited, but which we regard as in no way impairing the authority of the latter.

In *Alleghany Co.* v. *Parrish,* 93 Va. 619, the Code authorized purchase of land for the erection of a Court House, Clerk's Office and jail, and required *the residue* to be planted in trees and *kept as a place for meeting of the people.* The county Court let to Parrish a part of the Court House grounds for the erection of a law office, but afterwards brought suit in ejectment to compel its removal. Parrish filed a bill in equity to quiet title, and the bill was dismissed on demurrer. It is obvious that here the use of the property, outside of the prescribed buildings, was irrevocably fixed by the Code until altered by the Legislature. There was no property unused, or not needed for the public use to which it was dedicated, and consequently it was beyond the power of the county to override the legislative mandate that the whole residue be kept for a meeting place for the people.

In *Nerlein* v. *Village of Brooten,* 94 Minn. 361, a taxpayer and dealer in flour, feed and grain, sought to restrain the use of the town hall for a similar business, and was granted the relief sought. The facts developed were that the town hall was in use as such; that one Bohmer was President of the Village Council, and that the whole of the space in the building was not actually necessary for public use; that Bohmer for four years had been engaged in retailing flour at the hall in competition with the plaintiff, but without paying or agree-

ing to pay anything for the use of the hall, and there was
evidence that the plaintiff's business had been damaged by
this competition. It was also shown that the village bailiff
acted as clerk for Bohmer and conducted the business. The
Court found that the members of the Council knew of, and
permitted the conduct of, the business, and that they were
thus derelict in their duty in permitting their President to
prostitute his office by diverting the public property from its
public use—exclusively to his own private gain. The ele-
ment of fraud which permeated the case not only justified,
but required the granting of the injunction.

In *Sugar* v. *Monroe and Tom Stewart and Co.,* 108 La.
677, the plaintiffs were taxpayers, and owners and licensees
of an opera house in Monroe, and sought an injunction to
restrain the city from using its municipal school building as
a theatre. A bond issue had been voted for the erection of
certain improvements, including $20,000 for a school build-
ing. The city added $50,000 raised in some other manner
and built a fine house. Upon its completion, the city, under
cover of a pretended lease to the janitor of the school, under-
took to use the auditorium as a theatre. The Court said:
"The so-called lease is a flimsy contrivance which deserves
but little notice. The firm of Tom Stewart and Co. had no
existence when the lease was signed, and we think has none
now. Tom Stewart had been plaintiff's property manager at
their theatre, and was later made janitor of the school; but
the entire management of the auditorium, as a theatre, was
in the Chairman of the Committee of the City Finances."
The Court also said: "The case was not materially different
from what it would have been if the Mayor and City Council
had originally proposed to devote the $20,000, voted for a
school building, to the construction of a theatre and had been
enjoined from so doing." Referring to *Warden* v. *New Bed-
ford,* 131 Mass. 23, in which it was held "that while a city
could not erect a building for business purposes, but having
a city hall built in good faith and used for municipal pur-
poses, it has a right to allow it to be used incidentally for

other purposes, either gratuitously or for compensation," the Court, in the Louisiana case above, adds: "We find no reason to dissent from the views thus expressed and have little doubt they were appropriate to the case decided. We do not wish to be understood as going to the extreme of holding that the city authorities may not make such casual and incidental use of the building in question, not inconsistent with, or prejudicial to, the main purpose of its erection, as they may deem advisable, *nor as holding that changed conditions in the future may not justify them in·devoting it to some other purpose.*"

It having been shown that in making the lease now under consideration the city acted as a mere property holder, and entered into the contract with reference to the demised property, as any private proprietor might do, it follows that the doctrine of *ultra vires* cannot be invoked unless it has in some way been imported into the case by the subsequent concurrent action of the Mayor and City Council and the Field Officers in permitting the use of the armory for such engagements as have been already described—for the joint financial benefit of the city and the Field Officers, one-third to the city and the residue to the Field Officers.

We have read and considered with care the elaborate argument of the appellants covering twenty-six pages of their brief, relating to the organization of the Militia of the State and the powers and rights of the Field Officers in this case, and it is doubtless true, as contended, that they are mere governmental agencies, without corporate organization or powers; but we cannot perceive that this is at all material to be considered. Indeed, it would seem to follow from that fact that all power over that property, not capable of exercise by the Field Officers, remains unimpaired in the city. The armory has not ceased to be the unused property of the city, because the State has appropriated money to fit it up, and maintain it as an armory during its occupancy as such under the lease. It may be, though it is not necessary so to decide, that the Field Officers alone, under the lease, could not, against the will, or without the consent of the city, authorize

its use in the manner now under consideration. But they certainly control its use *as an armory,* and the city as certainly owns the reversion in the property, together with all control over its use which has not by that lease been vested in the Field Officers, and when the city and the Field Officers, together representing the absolute ownership and unqualified control of the property, consent and agree, as the record shows they have done, to this extended use of the property, for a further valuable consideration, equitably apportioned between them by their own agreement, we can perceive no defect of power to carry such agreement into execution, and it ought not in our judgment to be denied upon any mere technical ground, or any refinement of reasoning, however skilful. This is not like the case of the *Veterans 7th Regiment* v. *Field Officers 7th Regiment,* 38 N. Y. State Reporter, 48, cited by the appellants, where the Veterans sought to quiet their title to a part of the armory let to them by the Field Officers by debarring the latter from repudiating their lease and reasserting their former title. It is certainly immaterial to these plaintiffs, if the lease to the Field Officers was a valid lease, whether the powers thereby granted are, or are not, extended by a subsequent valid agreement.

But the appellants still further contend that the hiring out of the public property for such entertainments as the record shows is an unconstitutional invasion of the rights of citizens engaging their property in that business, in that it is a deprivation of liberty and property without due process of law, and they have specially requested us to express an opinion upon this branch of the argument. This is not the case of a municipal corporation perverting the functions of government by deliberately and indefinitely engaging in business for profit, and entering into competition with its taxpayers from whom it exacts a license which it does not itself pay. It is but the temporary, casual and incidental use of unused public property, done in the practice of a public economy to avoid loss of revenue upon such unused public property, and to lighten thereby the general burden of taxation. Such being

in our view the case before us, we cannot sustain the constitutional objections of the appellants.

*Decree affirmed with costs to the appellees above and below.*