COLWELL, Appellant, v. CITY OF GREAT FALLS, et al, Respondents

No. 8500

Submitted December 12, 1944. Decided March 23, 1945.

157 Pac. (2d) 1013

Messrs. Murch & Wuerthner of Great Falls for Appellant.

Mr. Albert H. Angstman of Helena and Mr. John L. Slattery,

Mr. Warren Toole and Mr. Leo C. Graybill, all of Great Falls, for Respondent.

HON. R. M. HATTERSLEY, District Judge, sitting in place of Justice Erickson, disqualified, delivered the opinion of the court.

The plaintiff brought this action against the City of Great Falls, its Mayor and City Council and one E. E. Harris to obtain an injunction against the defendants enjoining the leasing of the auditorium of the Civic Center Building, the property of the defendant city to the defendant E. E. Harris. The evidence is not before this court by Bill of Exceptions, and this court therefore is confined, except for implied findings, to the facts as specifically found as contained in the "Findings of Fact" of the trial judge. The case was tried before the court sitting without a jury and resulted in a judgment for the defendants. The trial court found the issues generally in favor of the defendants. The appeal is from the judgment.

From the "Findings of Fact" it appears that in the year 1938 following application to the Public Works Administration for an assisting grant, the taxpaying electors of the defendant city, under its Resolution No. 3080 calling an election, voted, and under its Resolution No. 3088 designating the form and providing for the sale of bonds, the defendant city advertised and sold a bond issue of $376,750 for the purpose of erecting a Civic Center. While the executory portion of Resolution No. 3080 referred only to "erecting a Civic Center to house the offices of the City Government," the following recitals preceded the same therein: "Whereas, there is need of a Civic Center to provide for conventions and other large public gatherings together with facilities for cultural and recreational activities; and Whereas, it is the plan of the City Council to erect a Civic Center Building to house the offices of the City officials and to provide for an auditorium suitable for Conventions and large public gatherings, together with facilities for Cultural and Recreational Activities;" while in Resolution No. 3088 both the executory portion thereof and the recitals therein as well as

the notice of sale of bonds, refer merely to a civic center to house the offices of the city government and to provide for conventions and other large public gatherings. In neither the proceedings for sale of bonds, nor in the proceedings for federal grant is there any declaration that the enumerated purposes for which the building was to be erected were exclusive, or that following the erection of the building no part of the same should under any circumstances, or in any event, be leased. Insofar as the application for federal grant is concerned, the reference to the character of the building set forth in so-called Resolution No. 3077 purporting to authorize the application, is "a Civic Center Building to house the offices of the City Government and to provide facilities for civic, cultural and recreational activities," while a like statement appears in the application. In the data supporting the application, in answer to a standard form question, it was stated that the project contemplated would not compete with any existing facility.

Among the items listed in the detailed estimate of cost of the building, enclosed with the application, were 2,000 opera seats and $12,000 worth of stage equipment. In addition, the floor plan drawings accompanying the application showed: On the basement floor: Four office and storage rooms, two storage rooms, two shower rooms, a boiler room, a refrigeration room, and corridors and stairways; on the First Floor: A stadium (variously called the Sports Arena or Ice Arena, having a seating capacity of 4,000), a kitchen, toilets, offices for the City Engineer, Treasurer, Water Department, Recreation Department and Public Health, and an Auditorium, with entrances, corridors, and stairways; and on the Second Floor: Separate offices for the Mayor, City Attorney and City Clerk, a Council Chambers, Committee Room, an exhibition room, a large banquet room, rest room, corridors and stairways, as well as the auditorium which latter in height extended to the roof of the building; and these drawings, among other things, further portrayed as a part of the auditorium in addition to the

main floor thereof, a balcony with a motion picture booth at the rear thereof, a stage and a ticket booth.

Subsequent to the application and following the sale of bonds the government of the United States made an offer of grant to the City "to aid in the financing and construction of a civic center building," which offer was accepted by Resolution No. 3129, setting forth the offer.

In the meantime a taxpayer's suit was brought by one John Lloyd against the city, its mayor, its council and its Board of Park Commissioners to enjoin the erection of a Civic Center Building on lands deeded to the city for park purposes, it being the contention of the plaintiff therein that the city was without right to use such lands for any purposes other than for parks and that the plaintiff and other taxpayers had a vested right to the enjoyment and use of these lands for park purposes of which they could not be divested without their consent. Paragraph IV of the affirmative defense of the defendants therein which included the Board of Park Commissioners, contained this allegation: "That the proposed building, if erected, will house the offices of the Mayor; the ex-officio Chairman of the Board of Park Commissioners; the Superintendent of Parks; the Attorney, Engineer and Clerk of the Park Board; and will provide a meeting place for the said Board of Park Commissioners, and will in every respect provide facilities for carrying on the business and the work of maintaining and improving the park system of the City of Great Falls, Montana, and will provide cultural and recreational facilities for the citizens of Great Falls, Montana." The following denial is contained in the reply therein: "Replying to Paragraph IV of the affirmative defense set forth and contained in the defendants' answer, plaintiff admits that said proposed building, if erected, will house the offices of the mayor, city attorney, city engineer, and other offices of the city government, denies each and every other matter, fact, and thing alleged and contained in said paragraph." This suit was disposed of on appeal by the Supreme Court affording the

city an opportunity to obtain waivers of the purpose restrictions in the deeds to the land.

As to the building in question, the grant was made by the federal government, and of the grant, $300,000, together with the proceeds of the bonds, was used by the city in constructing and equipping the building and landscaping the grounds, which work was done under the supervision of the Emergency Administration of Public Works. Of this aggregate fund, approximately $300,000 was used in constructing and equipping the auditorium in the building, of which $13,000 was spent in purchasing and installing opera chairs in the auditorium and $9,000 for stage equipment. The project was completed in the Spring of 1940, and the building was constructed substantially as detailed in the drawings, and, as a part of the auditorium there was constructed and at all times since there has been therein, in addition to the main floor, a balcony with a motion picture projection booth at the rear thereof, a stage, 1,882 seats, and a ticket booth, and the stage was among other things equipped with, and at all times since there has been therein, a large motion picture screen.

In addition to the facilities the auditorium provided, the building provided facilities for cultural and recreational activities as well as space and accommodations suitable for holding conventions and public gatherings both large and small, particularly the Exhibition Room (which was used as an Art Gallery up to the time it was used temporarily as a pilots' recreational room by the Seventh Ferrying Group of the Army Air Forces), the Banquet Room (which has a floor suitable for dancing, a small stage, a check room, and adjoining serving kitchen connected by dumbwaiters with the kitchen below, and portable tables and chairs sufficient to accommodate 500 persons), the Stadium (variously called the Sports Arena and Ice Arena), having a seating capacity of 4,000 persons, and a terrazzo floor equipped with refrigerating devices, which floor is suitable for dancing or skating, and the Council Chambers.

The building was opened for use on April 18, 1940. Three

days prior thereto the then council passed and the then mayor approved an emergency Ordinance No. 811, designating the city clerk as "Manager of the Civic Center Building" and providing for the renting of portions of the building, including the auditorium, the banquet room and sports arena. Shortly thereafter by an emergency Ordinance No. 814, the rental charge of the auditorium for religious, educational or charitable lectures or fraternal or club meetings where no admission is charged, was reduced from $75 to $50 for one day or evening performance. From time to time the auditorium was rented by the day and night, and for successive days and nights when asked for, and the rental, if any, paid.

From the time the building was opened in April, 1940, to the end of the fiscal year the auditorium was used only six times, or an average of about one night in twelve, for an aggregate gross rental of $150 for the quarter, while the expense of operating the entire building during such quarter amounted to $5,181.88, and in addition the city during such fiscal year paid out $28,663.75 on the bonded indebtedness on the building. The succeeding fiscal year followed the same pattern. During its twelve months the auditorium was used only thirty-two times or an average of about one night in eleven, for an aggregate gross rental of $1,850, while the operating expense of the building during such year amounted to $21,360.92, and in addition the city during such fiscal year paid out $28,236.25 on the bonded indebtedness of the building. Between July 1, 1941, and September 1, 1941, the latter the date of the beginning of the term of the interim lease hereinafter mentioned, the auditorium was used only two consecutive nights at a gross rental of $100. Whatever deficit arose in the operation of the building had to be paid out of the general fund of the city, which fund has been strained for years and which fund not only on July 1, 1941, faced, but subsequently suffered, a substantial loss in revenue by a reduction in the taxable reductions in the city.

Under the circumstances stated, the council on July 21, 1941,

passed by a two-thirds vote of all the members thereof, Ordinance No. 835, the interim lease which is the subject of this suit. While no bids were called for prior to the passage of this ordinance, the mayor between its passage and his approval of the same one week later, accorded the Fox Theater interests, which had five local theaters, an opportunity to offer a proposition, and was notified during such period that they had none to make. The Fox Theater chain rented all the other theater buildings in the city and while the rents for the same were higher for their seating capacity than those in the interim leasing ordinance, all of the theaters except one had operated at a loss during the preceding year, and with one exception none of them were kept open during the entire time, the others having been closed for protracted periods, their rental being too high compared to their revenue. So, too, all of the Fox Theaters were more centrally located with respect to the population of the city than the auditorium here involved. In order to justify the rent of a motion picture theater it was necessary that the operator have available to him a wide selection of first run motion picture films. Such selection was not available to E. E. Harris, the interim lessee under such ordinance, a monopoly thereon having been and now had by the Fox Theater chain which had and has the exclusive right to purchase all first run pictures except those produced by Universal. In consideration of such circumstances a monthly rental of $500 for the auditorium was not so inadequate as to render the same unconscionable, but was a high rental, for any operator who was not situated as favorably in respect to film selection as those enjoying such monopoly, to pay for the same.

The auditorium has never been dedicated or used for governmental purposes, and has never been used or required for the same. Use of the auditorium made by and available under the interim leasing ordinance No. 835 did not, and does not interfere with the use of the building for the public purposes to which it may be held in trust by the city, and is not inconsistent with such purposes, but subject thereto. Ordinance No.

835 at no time was approved by a majority vote of the tax--
payers of the City of Great Falls at an election called for that
purpose, nor was the ordinance ever referred to a vote of the
taxpayers, nor was an election called for that purpose. Section
two of Ordinance No. 835 contains the interim lease. By vir-
tue thereof the city leased the auditorium to the defendant
Harris for a term of five years beginning September 1, 1941,
for a rental of $34,500, payable in monthly instalments in
advance, viz.: $500 per month for the first twenty-four months,
and $625 per month for the next thirty-six months. While it
contained an option for an extension of five years at a higher
rental, such privilege was expressly limited to the approval of
the Council in office at the time of the beginning of the exten-
sory term. It further contains provisions as to the use, heat-
ing, lighting, indemnification for damages, alteration, meters,
sign, and repairs, as well as default, termination, fixture and
surrender clauses. There was no requirement of deposit of
advance rentals or money to insure the payment of rentals,
except the current monthly instalments which were paid.

The interim lease in the exception and reservation clause
immediately following the habendum, provides as follows:
"Subject, Nevertheless, to the following exceptions and/or
reservations created and/or saved, to-wit: (a) The arrange-
ments heretofore made by the said lessor for the holding of
five (5) engagements of the Great Falls Community Concert
Association, to be held on various dates, not yet specified in
the years 1941 and 1942, without such use working any deduc-
tion in the hereinafter mentioned rents, except and save for
the actual cost of the light and power consumed in said rental
property during such engagements: (b) The right of the said
lessor to have the use of the above rented property for conven-
tions and public gatherings, which right for the following
periods, upon the following notices, and upon the following
rental deductions shall remain inviolate and shall always be
available to the said lessor, to-wit: 1. For each evening, or
fraction thereof, upon fourteen (14) days' notice (or a lesser

time, if waived by the Lessee) in writing, given to the said Lessee by the Manager of the Civic Center Building of the said Lessor, without such use working any deduction in the hereinafter mentioned rents, except and save to the extent of Sixty Dollars ($60.00) and the actual cost of the light and power consumed in said rented property, including the foyer to said auditorium, during said evening, or fraction thereof; and by the term 'evening' it is hereby understood to mean the six (6) hour period of any day commencing at 6:00 o'Clock P. M. thereof. 2. For each afternoon, or fraction thereof, upon fourteen (14) days' notice (or a lesser time, if waived by said Lessee) in writing, given to the said Lessee by the Manager of the Civic Center Building of the said Lessor, without such use working any deduction in the hereinafter mentioned rents, except and save to the extent of Thirty Dollars ($30.00) and the actual cost of the light and power consumed in said rented property, including the foyer to said auditorium, during said afternoon, or fraction thereof; and by the term 'afternoon' it is hereby understood to mean the six (6) hour period of any day commencing at 12:00 o'clock noon thereof. 3. For each morning, or fraction thereof, upon three (3) days' notice (or a lesser time, if waived by the Lessee) in writing, given to the said Lessee by the Manager of the Civic Center Building of the said Lessor without such use working any deduction in the hereinafter mentioned rents, except and save to the extent of Ten Dollars ($10.00) and the actual cost of the light and power consumed in said rented property, including the foyer to said auditorium, during said morning, or fraction thereof; and by the term 'morning' it is hereby understood to mean the four (4) hour period of any day commencing at 8:00 o'clock A. M. thereof.''

In accordance with Section 3 of the Ordinance, defendant Harris duly accepted the interim lease, and was delivered possession of the auditorium in due course. On September 14, 1941, the defendant Harris, by public proclamation or statement made in the Great Falls Tribune, announced that he

would be willing to accept a six days' notice instead of fourteen days under the lease, and subsequently in August, 1942, his assignees Clarence Golder and Lee Preuninger to whom he had assigned the lease in the previous month, in confirmation of such public proclamation, executed and filed in the office of the city clerk a formal waiver of any notice in excess of six days.

The public has had access to the auditorium for the purpose of giving shows or lectures, holding conventions and otherwise. It has been occupied by a road show and was available for other road shows, and at the time of the trial had been engaged for a Christian Science Lecture and six engagements of the Great Falls Community Concert Association. For such engagements which were by renting directly from the city under subdivision (b) of the exception and reservation clause of interim Ordinance No. 835, the city, under paragraphs 1, 2 and 3 of such subdivision, within the diminished time established by waiver, notified the defendant Harris or his assigns, crediting this defendant or his assigns with the credit due him or them under the respective paragraphs and charging the person renting the auditorium from it with the rental fixed in Section 2 of the general renting Ordinance No. 811.

Under the interim leasing Ordinance No. 835 the defendant Harris on October 18, 1941, began operations in the auditorium of a motion picture theater operating nightly and on Saturday and Sunday afternoons. To that end he installed the most modern motion picture equipment in the projection booth, a great amount of wiring, carpet, furniture, carpet runners, stage carpet, and a masking screen. The investment in the projection booth amounted to $11,568, the carpeting to $1,675.65, and furniture, drapes and shades to $343. In addition he caused to be erected a large neon sign at a cost of $5,000 and installed an additional or alternative ticket booth for convenience of the public. The total cost of the improvements and equipment so installed was $21,655.27. Many items of this property could not be taken on moving and the sign would not be good on any

138

other building. Not only has the cost of lighting the auditorium, its foyer, the neon sign, all exterior lights, the lights in the men's lavatory and women's lavatory, but the cost of janitor service for the auditorium and its foyer has been defrayed by defendant Harris and his successors in interest. Further, the defendant Harris and his assigns thoroughly cleaned the auditorium daily, daily inspected the seats for damages, and have cleaned, repaired or recovered, as required, all of the seats without any expense to the city.

The plaintiff contends that the trial court erred in denying injunctive relief to the plaintiff, in all of its conclusions of law, and in refusing to declare the leasing Ordinance and agreement between the officers of the defendant city and the defendant, E. E. Harris, an ultra vires act and the lease void.

The plaintiff submits various contentions which will be considered in due course.

There is no question but that a taxpayer can maintain an action of this kind. McClintock v. City of Great Falls, 53 Mont. 221, 163 Pac. 99; Lloyd v. City of Great Falls, 107 Mont. 442, 86 Pac. (2d) 395.

The plaintiff contends that the city and its officers are estopped to assert and claim that the auditorium was not dedicated or to be held in trust for specific purposes as outlined in its Resolution No. 3080. The position of the plaintiff in this regard is based partly upon the position taken by the defendant city in the case of Lloyd v. City of Great Falls, supra, that the building was to be used in connection with park purposes, and partly upon representations made when the government grant was sought to the effect that the building was to be used for public purposes.

In support of his position as to estoppel, the plaintiff cites 21 C. J., p. 1223, Estoppel, Sec. 227, in part as follows: "A party who has, with knowledge of the facts, assumed a particular position in judicial proceedings, and has succeeded in maintaining that position, is estopped to assume a position inconsistent therewith to the prejudice of the adverse party. It is

necessary, however, that the claim or position previously assert-
ed or taken should have been successfully maintained that it
should be actually inconsistent with the position presently taken,
and that it should not have been taken through the fault of
the adverse party." However, Section 227 further states: "It
is essential also that the party claiming the estoppel should have
been misled by his opponent's conduct, that he should have acted
in reliance thereon, and that his rights would be injuriously
affected if his opponent were permitted to change his position.
When no wrong is done a change in position should and will be
allowed. The rule has no application where the knowledge or
means of knowledge of both parties is equal, nor in case of mis-
take. Also the rule has no application to change of position
with respect to matters of law."

The principal case involving equitable estoppel relied upon by
 plaintiff is that of Times-Mirror Company v. Superior
Court of Los Angeles County, 3 Cal. (2d) 309, 44 Pac. (2d) 547,
from which it appears that the City of Los Angeles began an ac-
tion of condemnation against the property of the Times-Mirror
Company for a Civic Center Building. This action caused the
plaintiff to move from the building it occupied and to spend in
excess of five million dollars to build new quarters for its news-
paper business. After institution of such action and protracted
litigation, the City of Los Angeles then decided to dismiss its
action of condemnation against plaintiff's property, changing
its position as to the litigation and abandoning same. On appli-
cation for Writ of Mandate to compel the City of Los Angeles
to proceed with its action of condemnation, the Supreme Court
of California held that the doctrine of equitable estoppel applied
and granted the application. In that case clearly the Times-
Mirror Company had been misled by the action taken by the
City of Los Angeles, had acted in reliance thereon, and its rights
would be injuriously affected if the City of Los Angeles were
permitted to change its position. In the instant case however
as will be shown hereafter, the taxpayers and citizens of the
City of Great Falls were manifestly benefited by the action

140

taken by the city, its mayor and city council, of which action the plaintiff herein complains. Further, the representations in the answer of the City of Great Falls defendant in the case of Lloyd v. City of Great Falls, supra, were not relied upon and were denied in the reply of the plaintiff therein, the action being disposed of on appeal by the Supreme Court affording the defendant City an opportunity to obtain waivers of the purpose restrictions in the deeds to the land in question.

As will be shown hereafter, whether or not the auditorium of the Civic Center was held in trust for specific purposes is not material in the view we take of this case, nor does the question of equitable estoppel enter into it.

It is generally conceded that a municipal corporation having erected a building in good faith for municipal or public purposes has the right, when such building is no longer used by the municipality, or when parts of it are not needed for public use, or when at intervals the whole building is not so used, and when it does not interfere with its public use, to permit it to be used either gratuitously or for a compensation for private purposes. (Note 31 L. R. A. (n. s.) 580; Worden v. New Bedford, 131 Mass. 23, 41 Am. Rep. 185; Lowry v. Forest City Borough, 39 Pa. Super. 276; 44 C. J. 1092; 19 R. C. L. 771; 38 Am. Jur. 168, 169; Notes, 133 A. L. R. 1241-1250, 63 A. L. R. p. 614-620; Cline v. City of Hickory, 207 N. C. 125, 176 S. E. 250; Clarey v. City of Philadelphia, 311 Pa. 11, 166 Atl. 237; Captain Charles v. Gridley Camp v. Board of Sup'rs of Butte County, 98 Cal. App. 585, 277 Pac. 500; Harris v. St. Louis, 233 Mo. App. 911, 111 S. W. (2d) 995; City of Biddeford v. Yates, 104 Me. 506, 72 A. 335, 15 Ann. Cas. 1091; Gottlieb-Knable Co. v. Macklin, 109 Md. 429, 71 Atl. 949, 31 L. R. A. (n. s.) 580, 16 Ann. Cas. 1092; French v. Inhabitants of Quincy, 3 Allen, Mass., 9; Bates v. Bassett, 60 Vt. 530, 15 Atl. 200, 1 L. R. A. 166; Kingman v. Brockton, 153 Mass. 255, 26 N. E. 998, 11 L. R. A. 123; Anderson v. Montevideo, 137 Minn. 179, 162 N. W. 1073; Town of Meredith v. Fullerton, 83 N. H. 124, 139 Atl. 359; City of Mission v.

Richards, Tex. Civ. App., 274 S. W. 269; Wheelock v. City of Lowell, 196 Mass. 220, 81 N. E. 977, 124 Am. St. Rep. 543, 547, 12 Ann. Cas. 1109; Jones v. Inhabitants of Sanford, 66 Me. 585; Bell v. City of Plattville, 71 Wis. 139, 36 N. W. 831; Stone v. Oconomowoc, 71 Wis. 155, 36 N. W. 829.)

In the case of Clarey v. Philadelphia, supra, it was held that a municipality had a legal right to rent its convention hall to promoters of professional boxing, wrestling and other sporting events, to which spectators were charged admission, when such use would not interfere with its use for public purposes, and the court refused therefore to grant an injunction to restrain such use of the building, saying: ''Unquestionably this hall, built with public funds upon property dedicated to public purposes, must be held to be devoted to public use. But there can be no sound reason why, when the hall is not required for public purposes, the city may not permit its use by private persons. From its very nature as a building designed to accommodate large groups of people, the hall cannot possibly be in demand for public gatherings for more than a small portion of the time, and necessarily must frequently be idle, yet with little diminution in the cost of maintenance. There can be no objection to the city's receiving a return from the use of the hall by private persons upon occasions when it would otherwise be idle. To say, under the facts of this case, that the city is engaging in private business — that of promoting sporting events or leasing buildings — is absurd. Complainant's contention is, in effect, that the hall must stand unused at all times when it is not in demand for strictly public use. Although he objects only to the use of the hall for professional sporting events, if his objection is sustained for the reasons he gives, or any reasons, the effect is to confine the use of the hall to purely public functions and thereby exclude its use for all private affairs, with the result that the city will be barred from receiving any revenue for its maintenance, and the entire cost thereof will have to be borne by the taxpayers. Such argument must be rejected. It is not sound in law or business practice. It would be folly to

require this large and expensive public structure to be kept idle when it is not needed for public use, and when it might be used by private persons for a proper rental, to the mutual advantage of the taxpayers of the city and those permitted to use it."

As to the contention that interim leasing Ordinance No. 835 ▮ of the defendant city is void as against public policy, appellant relies principally upon certain Kansas cases representative of which is the case of Glen W. Dickinson Theaters, Inc., v. Lambert, 136 Kan. 498, 16 Pac. (2d) 515, 516. In that case the Trustees of The Hiawatha Memorial Auditorium entered into a written lease with a third party, leasing to him the main floor, balcony and stage of the auditorium for one year "for the 'purpose of conducting and carrying on a moving picture show and road show business'." In its decision the court cited the case of State v. Kelly, 71 Kan. 811, 836, 81 Pac. 450, 70 L. R. A., 450, 6 Ann. Cas. 298, holding that a statute authorizing the State of Kansas to build and operate an oil refinery as a private business enterprise was unconstitutional. The decision in the case of Glen W. Dickinson Theaters, Inc., v. Lambert, supra, states that: "It has been the policy of our government to exalt the individual rather than the state * * * and to have the various units of our government perform governmental functions, leaving to individuals commercial enterprises for profit." The court in that case apparently took the position that the mere leasing of the premises for a moving picture and road show business involved the lessors of the property which belonged to Brown County and the City of Hiawatha in a commercial enterprise for profit. The court further held that if in fact the statute construed in its decision authorized the leasing of the building or any part thereof for the conduct of purely commercial enterprise, it would be void as against the public policy of the state.

The facts in the instant case fail to show that the defendant City of Great Falls by the leasing of the auditorium of its Civic Center building was engaged in a commercial enterprise for profit or in private business. (Clarey v. Philadelphia, supra.)

As to the question of such a leasing being void as against public policy, the case of Young v. Board of Trustees, 90 Mont. 576, 583, 4 Pac. (2d) 725, held that as public dances, both within and without incorporated cities and towns are recognized by our state legislature as proper forms of public entertainment subject only to reasonable regulation, it cannot be said that in this state the renting of school property for such purposes is contrary to public policy. Moving picture shows within cities and towns also have been recognized by our legislature as proper forms of public entertainment. (Sec. 2439, Revised Codes of 1935; Chapter 91, Laws of 1937, and Chapter 71, Laws of 1941.) By a parity of reasoning therefore, it cannot be said that in this state the renting of municipal property for moving picture shows is contrary to public policy.

The contention that the defendant city will be compelled to repay to the government the grant under the Public Works Administration Act of 1938, 15 U. S. C. A. Sec. 721-728, is without merit. Ordinance No. 835, the interim leasing ordinance, or the lease thereunder made, did not and does not constitute any violation of any agreement between the defendant city and the United States of America. There is nothing in the agreement forbidding the use of the auditorium as provided under the terms of such ordinance, and such use does not constitute a breach of the agreement.

Under the terms of 44 C. F. R., 222.1, a regulation of the Public Works Administration based on Staff Order No. 39, Federal Emergency Administrator of Public Works, June 1, 1938, which was codified pursuant to Section 11 of the Federal Register Act as amended, 50 Stats. 304, 44 U. S. C. A. 311; "The finance agreement, to which the United States of America and the applicant are parties, consists of an offer on the part of the government and the applicant's acceptance thereof. Such agreement contains the terms and conditions upon which the government offers to make a loan and grant, a loan only or a grant only, as the case may be. It describes the project briefly and states the amount of the loan and grant, the loan only

or the grant only, as the case may be.'' The offer on the part of the government and the acceptance thereof appear in Resolution No. 3129. There are no terms or conditions either in the offer or in the acceptance which forbid the use of the auditorium made, or available under the interim leasing Ordinance No. 835.

The Civic Center Building was constructed as a public building, and ever since has been a public building, built and maintained by the defendant city for public purposes, which purposes have not been abrogated or interfered with by the use made, or available, under the interim leasing Ordinance No. 835, this use being subject to and in subordination to any public use to which the building may have been held in trust. The finance agreement, or the law, not having forbidden the future ad interim use to which the auditorium was subsequently put under the terms of Ordinance No. 835, there is no breach of agreement nor violation of law of which the government could complain. In view of this it follows that no judgment could be obtained against the city by the government in any amount, and in consequence thereof, neither the plaintiff nor other taxpayers of the defendant city would suffer any irreparable or other injury. Indeed a benefit would and does result to them by the interim renting of the auditorium of the Civic Center Building at such times as it is not needed for other purposes as provided in the exception clause of the lease under the interim leasing Ordinance No. 835. Further, there is no reasonable probability that injury will be done if no injunction is granted, and there is no evidence in the case disclosing that there was even a remote threat or possibility that the government contemplated taking steps, fruitless as shown, to recover its grant or any part thereof. On the contrary it is to be implied that such evidence as was introduced in the case shows that there was no violation of any agreement between the city and the United States of America.

The proposition that by the leasing by the defendant city under the provisions of the interim leasing Ordinance No. 835, the city is engaged in private business, thereby sub-

jecting the property, that is the Civic Center Building, to the burden of taxation, is not well-founded. The city under the circumstances shown and the authority heretofore quoted, is not in any way engaged in private business. Again under the provisions of the Constitution of the State of Montana, Article XII, Sec. 2, it is provided "The property of the United States, the state, counties, cities, towns, school districts, municipal corporations and public libraries shall be exempt from taxation." As to this class of exempted property, it is absolutely exempt, regardless of the question of exclusive use. (Town of Cascade v. County of Cascade, 75 Mont. 304, 308, 243 Pac. 806.) See also case of Cruse v. Fischl, 55 Mont. 258, 263, 175 Pac. 878, 879, holding as to the class of property heretofore mentioned: "The authority to tax any property of the first class is denied the lawmakers absolutely. The provision is mandatory in character, is self-executing and the legislation thereafter enacted declaring property of that class exempt added nothing to its force or effectiveness." To quote the holding in the case of Springville v. Johnson, 10 Utah 351, 37 Pac. 577, 578, where the state constitutional exemption was the same: "The exemption from taxation of the property of cities is so clear and expressive that there would seem to be no room for any doubt, or necessity of resorting to any rule of construction. The exemption is absolute and depends upon no condition but ownership by the city. ([Vicksburg, S. & P.] Railroad Co. v. Dennis, 116 U. S. 665, 6 S. Ct. 625 [29 L. Ed. 770])"

As to the contention that the interim leasing Ordinance No. 835, and the lease entered into thereunder between the defendant city and the defendant E. E. Harris are not valid for the reason that the defendant city, under the provisions of Sec. 5039.61, Revised Codes of 1935 as amended by Chapter 35 of the Laws of 1937, did not submit the question of such leasing to the taxpayers of the city at an election called for that purpose, to be approved by a majority vote of such taxpayers, it was not necessary under the facts shown in this case so to submit this question. Conceding that the Civic Center Building

of the defendant city was held in trust for a specific purpose, the lease in question with the exception therein contained, did not interfere with the use of the property for the public purposes for which it was held in trust, was and is not inconsistent therewith and was and is a lawful exercise of the authority of the defendant city to lease its property, irrespective of whether or not it was held in trust for a specific purpose. Sec. 5039.61, supra, was designed to permit the cities and towns of this state, with the approval of a majority vote of their taxpayers, to sell or lease their property which was held in trust for a specific purpose, in abrogation of, or in substantial interference with the use of the property for such specific purpose. There are no such facts in this case, hence it was not necessary for the defendant city to secure the approval as contemplated by the provisions of Sec. 5039.61, supra.

The question of the amount and nature of the consideration received or to be received under the provisions of Ordinance No. 835 is a matter which only concerned and only concerns the mayor and council of the defendant city and a court of equity will not interfere at the suit of a taxpayer to restrain the officers of a municipal corporation in the exercise of their discretionary powers, which exist herein, with regard to the control or disposition of the property of the municipality, in the absence of illegality, fraud, or clear abuse of their authority, and none of these factors appear in this case. (43 C. J. p. 296, 299; 44 C. J. pp. 1390, 1391, 1402, 1403, 1412, 1413, 1414; Cordingley v. Borough of Mendham, 171 A. 158, 12 N. J. Misc. 331; Bates v. Bassett, 60 Vt. 530, 15 Atl. 200, 1 L. R. A. 166; French v. Inhabitants of Quincy, 3 Allen, Mass., 9, 12; Jones v. Inhabitants of Sanford, 66 Me. 585, 591; Blood v. Manchester Electric Light Co., 68 N. H. 340, 342, 39 Atl. 335.)

In Seafeldt v. Port of Astoria, 141 Ore. 418, 16 Pac. (2d) 943, 945, the court said: "The contract the performance of which is sought to be enjoined in this suit is not a contract to sell the dredge, but to hire out its use and the labor of its operators for a compensation deemed adequate by the board of

commissioners of the port. The amount and nature of the consideration received by the board in exchange for the use of its dredge and for the labor of its operators, since it had the power to authorize such use, was a matter that concerned the port only. (Roberts v. Northern Pacific R. Co., 158 U. S. 1, 15 S. Ct. 756, 39 L. Ed. 873.) It is well settled that a court of equity will not interfere in the suit of a taxpayer to restrain the officers of a muncipal corporation in the exercise of their diccretionary powers with regard to the control or disposition of the property of the municipality, in the absence of illegality, fraud, or clear abuse of their authority. (28 A. & E. Encyc. of Law, 991; 28 Cyc. 1744; 44 C. J. 1411; Haesloop v. City Council of Charleston, 123 S. C. 272, 115 S. E. 596).''

Moreover in this case the trial court found, and the facts so found show, that the conditions of the lease entered into under the provisions of Ordinance No. 835 were reasonable and the consideration adequate under the circumstances existing.

A city has no right, as a primary purpose, to erect buildings to rent; but if on erection of a building for its proper municipal uses, it believes that it will lighten the burden of its taxpayers to rent a part of its building, whereby an income is gained, in such manner as not to interfere with the uses for which it primarily was designed, there is no sound reason suggested why it may not do so. Clarey v. Philadelphia, supra; Bates v. Bassett, supra. In Anderson v. Montevideo, supra, the plaintiff sought an injunction to restrain the leasing by a city of an auditorium in a municipal building for use in conducting moving picture shows. The court said [137 Minn. 179, 162 N. W. 1074] : ''The inquiry is one of power. Had the city the right to lease the auditorium as it did? True it would have no right to erect buildings primarily to rent, but if, in erecting a building for its municipal affairs, an auditorium was included in the structure intended and designed for public gatherings, and subsequently conditions became such that the same was no longer needed for the purposes or use of the municipality, and that by leasing the same a better income would be derived and

the burden of taxation lightened, we see no sound reason why it may not legally do so. (Gottlieb-Knabe & Co. v. Macklin [1909], 109 Md. 429, 71 A. 949, 31 L. R. A. (n. s.) 580, 16 Ann. Cas. 1092).''

In conclusion, it appears to the court that in the leasing of the auditorium of the Civic Center Building of the defendant city, under the terms of the interim leasing Ordinance No. 835, the City Council and Mayor of the City of Great Falls acted wisely and for the best interests of the taxpayers of the defendant city, and that there can be no legal objection to the action taken by them in this regard.

Other contentions of the plaintiff and appellant have been considered, and we find no reversible error in the record. The judgment accordingly is affirmed.

Chief Justice Johnson, Associate Justices Morris and Adair concur and the Hon. George W. Padbury, Jr., District Judge (sitting in place of Associate Justice Anderson, disqualified) concur.