GARY L. GREENER et al., Plaintiffs and Appellants, v.
The CITY OF GREAT FALLS, JOHN J. McLAUGHLIN,
Mayor of the City of Great Falls, and JOSEPH L. Mc-
DONALD, Treasurer of the City of Great Falls, Defend-
ants and Respondents.

No. 11993.
Submitted May 12, 1971.
Decided June 9, 1971.
485 P.2d 932.

378

Dirk Larsen, argued, Great Falls, for plaintiffs-appellants.

William Conklin, City Atty., argued, Patrick L. Paul appeared, Great Falls, for defendants-respondents.

MR. JUSTICE HASWELL delivered the Opinion of the Court.

This is an action by certain taxpayers and electors of the city of Great Falls against the city, its mayor, and its city treasurer seeking an injunction to restrain construction of a city shop complex, until such time as the electors approve the issuance and sale of municipal bonds to finance construction. The District Court of Cascade County entered a partial summary judgment and subsequently a final judgment denying the injunction and dismissing the complaint. Plaintiff taxpayers and electors appeal from the partial summary judgment and subsequent final judgment.

Plaintiffs and appellants are sixteen taxpayers and electors of the city of Great Falls. Defendants and respondents are the city of Great Falls, its mayor, and its city treasurer.

The facts, with one exception, are contained in a written stipulation and are not in dispute. These facts were adopted by the district court in its findings of fact, on which its partial summary judgment was based.

These undisputed facts as set forth in the district court's findings and in the record herein disclose that the city proposes to construct a consolidated city shop complex west of the U.S. Highway #87 and north of 25th Avenue N.E. in the Riverview Addition to Great Falls at a cost of over $500,000. This facility is intended to provide maintenance and repair for all city vehicles used by the various departments and agencies of the city of Great Falls. The city shop complex will consist of the

following buildings to be used either jointly or exclusively as indicated, by the following city departments and agencies:

(1) Animal Control Shelter for the exclusive use of the Animal Control department.

(2) Water and Sewer shop and storage facility for the exclusive use of the Water and Sewer department.

(3) Garbage vehicle garage for the exclusive use of the Garbage department.

(4) Combined maintenance shop and central office and lunch facility for service and maintenance of all city vehicles.

(5) Several open, unheated vehicle storage facilities for all city vehicles.

On April 16, 1970 the following petition, signed by over 20% of the qualified and registered electors of the city of Great Falls, was filed with the city clerk:

"TO THE HONORABLE MAYOR AND COUNCIL OF THE CITY OF GREAT FALLS, MONTANA:

"GENTLEMEN:

"WE, the undersigned, qualified electors of the City of Great Falls, Cascade County, Montana, who are taxpayers upon the property within the City of Great Falls, Montana and whose names appear on the last completed assessment roll of the State and County taxes as taxpayers within said City, having been informed that the present administration of the City of Great Falls plans to construct a city shop complex with funds to be taken from various city departments such as the airport, library, park, street, water, sewer and garbage, over a period of years, and being of the belief that this plan is not in the best interests of these city departments or the City of Great Falls, and believing that the taxpayers should be entitled to vote for or against substantial capital expenditures as proposed, hereby respectfully petition and ask your Honorable Body that an election be held in said city at the next regular general City election April 5, 1971, for the purpose of submitting to the qualified electors of the City of Great Falls, Montana

and whose names appear on the last completed assessment roll of the State and County taxes as taxpayers within said City, the following question, to-wit:

"SHALL THE COUNCIL OF THE CITY OF GREAT FALLS, MONTANA BE AUTHORIZED AND EMPOWERED TO ISSUE AND SELL BONDS OF SAID CITY IN THE AMOUNT OF $600,000.00 FOR THE PURPOSE OF PAYING FOR THE COST OF ACQUIRING SUCH ADDITIONAL LAND AS MAY BE REQUIRED AND TO CONSTRUCT A CITY SHOP COMPLEX TO BE LOCATED ON AND ADJACENT TO THE LAND PRESENTLY OWNED BY THE CITY AT 15TH STREET NORTH AND 12TH AVENUE NORTH IN GREAT FALLS, MONTANA?

"Each of the undersigned for himself or herself states that he or she has personally signed this petition and knows the contents thereof, and that his or her residence address and voting precinct are written correctly after his or her name."

At its regular meeting on May 18, 1970, the city council adopted a report holding this petition to be invalid. At that time and on other occasions, the city council declared its intention not to call a bond issue election to finance the construction of the city shop complex.

Instead, the city council adopted a different financing plan to cover the construction costs of the consolidated city shop complex. Under this proposed financing plan the city contemplates payment of construction costs partially from general fund moneys and partially through allocation of moneys in special funds of the various city departments and agencies that will use the facility.

The city council ordered publication of an invitation for bids on construction of the city shop complex. It calls for "one single contract, including general, mechanical, and electrical work." Payment by the city of construction costs is to be made on the basis of a down payment which will be paid as job progress payments to the contractor with the balance of payments to be

made in monthly installments for a period not to exceed five years under a contract of sales secured either by land severance provisions or a lease of the building site.

The city budget for the fiscal year 1969-1970 contains an appropriation of $119,500 from the general fund for financing construction of the city shop complex. This sum was transferred into the general fund from proceeds derived from the sale of general obligation bonds of the city for modernization and construction of fire stations and Fire department facilities. The issuance and sale of these bonds had been previously authorized by the taxpaying electors of the city at an election held on April 7, 1969 pursuant to a Fire department modernization and expansion program. The proceeds from the bond sale were placed in a special fund known as the Fire Department Modernization and Expansion Fund. Thereafter $119,500 of this fund was transferred to the general fund of the city as a form of payment for the commitment by the city of four city-owned lots in the vicinity of 9th Street and 1st Avenue South as a site for a new Headquarters Fire Station. The city also purchased an adjoining fifth lot from private owners for $31,000 from the proceeds of the bond sale which, together with the other four lots, is to be used as a site for the new Headquarters Fire Station. The prospectus for the proposed fire station program which was designed to provide information to city officials and citizens concerning the Fire Department Modernization and Expansion Program bond issue earmarked the sum of $150,000 for the site acquisition for the new Headquarters Fire Station.

The city budget for the fiscal year 1969-1970 also contains an additional appropriation of $13,587.89 from the general fund to defray the construction costs of the city shop complex. The city plans to pay the balance due for the construction and purchase costs of the city shop complex with money appropriated from its general fund to be raised by the sale of other city-owned property, specifically the old West-Side Fire Station and the Hall Perry Machine Shop property.

Special fund moneys allocated to construction costs of the

·city shop complex from various city departments and sources which are included in the city budget for the fiscal year 1969-1970 consist of the following:

(1)  Water department, $25,000.00
(2)  Sewer department, $15,000.00
(3)  Garbage department, $25,000.00
(4)  Animal Control department, $10,000.00
(5)  Street department, $25,000.00
(6)  Park department, $5,000.00
(7)  Library, $5,000.00
(8)  Airport, $10,000.00

The city intends to include essentially the same allocations and amounts from most but not all of the same departments in its budget for the 1970-1971 fiscal year, and to continue allocating money from some of these same city departments for one or two more years thereafter.

The Water and Sewer department, Garbage department, Street department, Park department, Library and Municipal Airport all have both heavy-duty and light-duty motor vehicles, and other equipment, which require special facilities and personnel for maintenance and repair.

The operation of the Animal Control department is funded from the general fund of the city, and none of its operating revenue is derived from any special levy or trust fund.

On July 23, 1970 plaintiff taxpayers and electors filed their complaint against the city, its mayor, and its treasurer, seeking to enjoin the city and its officials from constructing the city shop complex "until and unless the electors of the city of Great Falls shall vote to issue and sell bonds for the purpose of paying for the cost of construction of a new city Shop Complex." The issues raised by this complaint are the issues for review in this appeal which will be set forth hereinafter.

Defendant city and its officials thereafter answered this complaint, the contents of which will not be set forth in view of the later written stipulation and agreement of the parties on the facts. Plaintiffs and defendants each moved for summary

judgment in their respective favor. The motions for summary judgment by the respective parties came on for hearing before Judge Hatfield on the basis of the agreed facts, admissions in the pleadings, and legal memoranda.

On August 20, 1970 Judge Hatfield entered the district court's findings of fact, conclusions of law, and partial summary judgment. The findings of fact constituted the agreed facts and admissions in the pleadings heretofore set forth. The conclusions of law, in summarized form, were: (1) that the plaintiffs had standing to prosecute the action; (2) that the city was not legally required to proceed with a general obligation bond issue to finance construction costs of the city shop complex, but was specifically empowered by section 11-1202, R.C.M.1947, as amended, to finance such construction costs with a contract payable in installments over a five year period without submitting the question to a vote of the taxpaying electors; (3) that the city was empowered to appropriate moneys from the general fund to pay all or part of such construction costs; (4) that the transfer of $119,500 to the general fund as a form of payment for acquisition of the four lots to be used as a site for the Headquarters Fire Station was lawful; (5) that the city was legally authorized to appropriate moneys from Animal Control funds, Garbage funds, and Water and Sewer funds to defray construction costs of facilities required by these departments for their exclusive use; (6) that the city is legally authorized to appropriate and expend Airport funds, Animal Control funds, Library funds, Park funds, Street funds, Garbage funds, and Water and Sewer funds to defray their proportionate share of construction costs of joint use shop and storage facilities included in the city shop complex. The district court included the following additional conclusion of law quoted verbatim as follows:

"However, the Court finds and concludes that there is insufficient information before it upon which to reach a final conclusion that the amounts appropriated and to be appropriated from the above named special funds constitute fair pro-

portionate shares of the costs of said joint use shop and storage facilities;''

On the basis of the foregoing findings of fact and conclusions of law, the district court entered a partial summary judgment in favor of defendants and against plaintiffs ''dismissing the complaint and this action with prejudice insofar as the same seek to restrain and enjoin the City of Great Falls from'':

1. Financing construction of the city shop complex with a contract payable in installments over a five year period and failing to submit the question of a bond issue to the electors;

2. Appropriating moneys from the general fund to defray all or part of construction costs of the consolidated city shop complex;

3. Transferring $119,500 from the Fire Department Modernization and Expansion Bond Fund to the general fund as a form of payment for the four lots to be used as a site for the Headquarters Fire Station; and

4. Appropriating funds from the Animal Control section of the general fund, from the Garbage fund, and from the Water and Sewer fund for defraying all or part of the construction costs of facilities devoted to the exclusive use of these departments. A final provision of the partial summary judgment ordered the city to ''make a further showing to this Court of the amounts intended to be appropriated from Airport funds, Animal Control funds, Library funds, Park funds, Street funds, Garbage funds, and Water and Sewer funds to defray a portion of the cost of constructing the joint use shop and storage facilities included in the Consolidated City Shop Complex'' and to show ''that said amounts are fair proportionate shares for each of said special funds based upon some reasonable comparison between all city departments using said joint use shop and storage facility.'' Included therein was a provision that if the city failed to make such showing, an injunction against appropriation or expenditure of any moneys from these special funds to defray a portion of the construction costs of the joint use

shop and storage facility included in the city shop complex would issue.

Thereafter the district court held a further hearing at which all evidence presented by the parties was considered pertaining to the issues indicated in the partial summary judgment. Witnesses testifying for plaintiffs were Leo Graybill, Jr., Chairman of the Airport Commission of the City of Great Falls; Art Pahl, Chairman of the Water and Sewer Committee of the City of Great Falls; and Mrs. Margaret Warden, Chairman of the Great Falls Public Library Board. Witnesses for defendants were the Honorable John McLaughlin, mayor of the City of Great Falls; Louis Fontana, city engineer; Willard Hochhalter, alderman and member of the ways and means committee of the city council; and Phillip W. Korell, architect for the city shop complex.

Following this hearing, the district court entered additional findings of fact, conclusions of law, and a final judgment on September 18, 1970. The additional findings of fact covered controverted issues of fact and provided in summarized form:

1. That the estimated total cost of the joint use shop and storage buildings to be included within the city shop complex was $276,594;

2. That the relative percentages of total vehicle maintenance of the various departments of the city are: Water and Sewer department, 13.1%; Garbage department, 28.6%; Street department, 28.3%; Park department, 3.4%; Library, 2.4%; Airport, 7.3%; and General Fund, 16.89%;

3. That based on such proportional use, the relative contribution of each special fund department would be substantially less than the amounts the city intends to allocate from such special funds to defray construction costs;

4. That the balance of construction costs would be appropriated from the general fund and from the sale of the Hall Perry Machine Shop property; and

5. That the amounts to be appropriated from the special funds are well within their fair proportionate share based upon

comparison of expenditures for vehicle maintenance and anticipated use of the joint facilities.

Conclusions of law were entered accordingly. Final judgment was entered in favor of defendants denying the injunction and dismissing plaintiffs' complaint.

Plaintiffs now appeal from the partial summary judgment entered by the district court on August 20, 1970 and from the final judgment of the district court entered on September 18, 1970.

We will summarize the underlying issues upon appeal in this manner:

1. Is the city required to call a general obligation bond issue election to finance the cost of construction of the consolidated city shop complex?

2. Is the transfer of $119,500 from the Fire Department Modernization and Expansion Fund to the general fund legally permissible?

3. Are appropriations and expenditures from the special funds of the various city departments for construction costs of the consolidated city shop complex legally authorized?

4. Are the specific proposed contributions of the various departments from their special funds toward construction costs of the joint vehicle maintenance facilities included in the consolidated city shop complex within legally permissible limits?

Additionally one further issue was raised by plaintiffs on oral argument which was not included as an issue for review in their brief, viz: whether the district court decided disputed questions of fact upon the respective parties' motions for summary judgment.

The first issue for review is one of the fundamental issues in this controversy and includes a series of related questions. Plaintiffs contend (1) that the city is required to call a general obligation bond issue for the purpose of financing the construction of the city shop complex upon filing a petition signed by over 20% of the registered electors of the city, (2) that the city is not empowered to finance such construction except by a

general obligation bond issue or borrowing, and (3) that the city has no discretion to finance such construction by an installment contract extending over a 5 year period.

We hold that the city is not required to call a general obligation bond election to finance construction of the city shop complex under the circumstances disclosed here. We note that the petition calling for such election, although containing the required number of signatures of qualified electors and taxpayers, is invalid. It not only calls for an election on the issuance and sale of general obligation bonds for the acquisition of land for a site for the city shop complex and construction of the same, but purports to include the location of the building site. The petition in question calls for submission of the following questions at the next general election on April 5, 1971:

"Shall the Council of the City of Great Falls, Montana be authorized and empowered to issue and sell bonds of said city in the amount of $600,000.00 for the purpose of paying for the cost of acquiring additional land as may be required and to construct a city shop complex *to be located on and adjacent to the land presently owned by the city at 15th Street North and 12th Avenue North, in Great Falls, Montana?"* (Emphasis added.)

There is no provision in the statutes of Montana for a site location election for municipal buildings such as the city shop complex.

The restrictive form of the petition designating the site location conflicts with the holding of this Court in Carlson v. City of Helena, 39 Mont. 82, 102 P. 39. In that case the electors had authorized the city to sell bonds for the purpose of securing a water supply for the city from McClellan Creek. In granting a taxpayer injunction against the sale of the bonds, the Montana Supreme Court had this to say:

"A more serious and difficult question arises out of the contention that the city council has no authority to submit to the electors the question whether a particular water supply must be obtained, or, if it has, that the question may not be submitted

in this restricted form until it has first been ascertained that the particular supply is available and what its cost will be. In other words, the contention is that the council is authorized to consult the taxpayers generally as to whether it may proceed to acquire a supply of water for the city, but that it may not divest itself of the discretion vested in it by law, as the governing body of the city, by leaving it to the electors to select a particular supply. This objection, it is said, is fundamental, because the discretion to purchase a particular supply is vested in the council, and this discretion cannot ordinarily be exercised until the council has ascertained that the particular supply is available, and that the cost of acquiring and installing it can be compassed by the amount of the indebtedness to be incurred. The contention must be sustained.''

Accordingly, in the instant case, the discretion to select the site for the city shop complex being vested in the city council, it cannot be divested by submitting the site location to the taxpaying electors.

Plaintiffs cite State ex rel. Wildin v. Eickoff, 84 Mont. 539, 276 P. 954, as authority for submitting the question of site location to the electors. This case is readily distinguishable and furnishes no support to plaintiffs' position in the instant case. *Wildin* involved a site location for a school in a third class school district under a specific statute requiring elector approval of school sites, while in the instant case there is no statutory authorization for a site election for the city shop complex and discretion to select the site is vested in the city council.

Plaintiffs' second and third contentions on this issue are interrelated and will be discussed together. They argue that the city is not empowered to finance construction of public buildings except by bond issue or borrowing, and that there is no statutory authority for financing such construction by a five-year installment contract as proposed by the city.

Montana cities are granted power to build necessary public buildings by section 11-905, R.C.M.1947. They are given the power to borrow money or issue bonds for the erection of public

buildings by the provisions of section 11-966, R.C.M.1947. But is this method exclusive? Not at all. Section 11-1202, R.C.M. 1947, as amended, provides in pertinent part:

"Awarding contracts — advertisement — limitations—installments—sales of supplies—*construction of buildings*—purchases from government agencies—exemptions. All contracts for * * * the construction of any building, for which must be paid a sum exceeding two thousand five hundred dollars ($2,500.00), must be let to the lowest responsible bidder after advertisement for bids; provided that no contract shall be let extending over a period of five (5) years or more without first submitting the question to a vote of the taxpaying electors of said city or town. * * *

"When the amount to be paid under any such contract shall exceed two thousand five hundred dollars ($2,500.00) the council may provide for the payment of such an amount in installments extending over a period of not more than five (5) years; provided that when such amount is extended over a term of two (2) years at least forty per centum (40%) thereof shall be paid the first year and the remainder the second year, and when such amount is extended over a term of three (3) years, at least one-third (1/3) thereof shall be paid each year, and if such amount is extended over a term of four (4) years, at least one-fourth (1/4) is to be paid each year, and if such amount is extended over a term of five (5) years, at least one-fifth (1/5) is to be paid each year; provided that at the time of entering into such contract, there shall be an unexpended balance of appropriation in the budget for the then current fiscal year available and sufficient to meet and take care of such portion of the contract price as is payable during the then current fiscal year, and the budget for each following year, in which any portion of such purchase price is to be paid, shall contain an appropriation for the purpose of paying the same." (Emphasis added.)

This statute specifically applies to the construction of public buildings, specifically authorizes financing under an installment contract not exceeding five years, specifically authorizes budg-

eting and appropriations in future years during the life of the contract, and contains no requirement of a taxpayer election where the installment financing does not exceed five years. This statute expressly authorizes an alternate method of financing construction of municipal buildings to that of borrowing or a band issue.

Plaintiffs cite the holding of this Court in Dietrich v. City of Deer Lodge, 124 Mont. 8, 218 P.2d 708 as supporting their position that the authority of a city to incur an indebtedness for the erection of public buildings is found only in section 11-966, R.C.M.1947 relating to bond issues and borrowing. Dietrich was decided in 1950 and at that time section 11-1202, R.C.M.1947 relating to installment financing did not apply to public buildings; an amendment of section 11-1202 in 1963 specifically made this section applicable to public buildings. Accordingly, Dietrich lends no support to plaintiffs here.

The second issue for review pertains to the legality of the transfer of $119,500 from the Fire Department Modernization and Expansion Fund into the general fund as a form of payment for the four city-owned lots to be used as a site for a Headquarters Fire Station. Plaintiffs argue that the taxpayers voted for bonds to build a fire station and that money cannot be diverted to building a city shop, but must be returned to the taxpayers. Plaintiffs characterize the city's action here as an unlawful diversion of trust funds.

This contention ignores many material facts in the instant case. The four city-owned lots were a general asset of the city used for many years as the site of the old city shop building. The prospectus on the bond issue election for Fire Department Modernization and Expansion earmarked $150,000 for site acquisition of the Headquarters Fire Station. The question submitted to the taxpaying electors at this election specifically included as a purpose for the issuance and sale of the bonds the relocation and construction of a Headquarters Fire Station. The four city-owned lots constitute a suitable site for the new Headquarters Fire Station. The city was under no obligation

to furnish these lots free of charge for a bonded fund purpose, thereby depleting its general fund assets in order to reduce site acquisition costs of the bonded Fire department project. Certainly the city could have sold its four lots to a private individual and placed the proceeds in the general fund for use in payment of the 5 year installment financing of the city shop complex. Is the situation any different where it furnishes the four lots as a site for a new Headquarters Fire Station and accepts in exchange a sum of money for its general fund which money was authorized by the taxpaying electors for site acquisition? We fail to see any distinction under the circumstances here.

The only remaining question is whether the $119,500 was the actual and reasonable value of the four city-owned lots. This amounts to approximately $30,000 per lot. The adjoining lot was purchased by the city from private owners for $31,000 for the same site purpose. The district court in its findings of fact made an express finding "that the sum of $119,500 was and is a reasonable purchase value" for the four city-owned lots to which no exception was taken.

Accordingly, we hold that the $119,500 transfer from the bond fund to the general fund as a form of payment for the four lots in question was lawful under the circumstances of the instant case.

The third issue concerns the broad question of legality of appropriations and expenditures from special funds of the various city departments in payment of construction costs of the city shop complex. The fourth issue specifically concerns the legality of the specific appropriations and expenditures and the amounts thereof involved in the present case. As these two issues are interrelated, they will be discussed together.

Initially plaintiffs argue that Airport funds, Animal Control funds, Library funds, Street funds, Garbage funds, and Water and Sewer funds are special trust funds for particular purposes which the city may not unlawfully expend for construction of the city shop complex. They point out specific

statutes requiring separate budgeting, separate sets of books, and separate accounting and expenditure provisions relating to each of these departments: Water and Sewer department (section 11-2220); Park department (sections 62-205 and 84-4701); Library (sections 44-220 and 44-222); Airport (section 1-817); and Street department (section 84-1840).

Speaking generally, these statutes require that separate books and accounts be kept of these separate departments, that separate budgets be submitted by each department covering proposed expenditures, and that revenues and tax levy proceeds be devoted exclusively to the respective purposes of each department.

■ The city shop complex contains three buildings for the exclusive use of particular departments: (1) an Animal Control shelter for the exclusive use of the Animal Control department; (2) Water and Sewer shop and storage building for the exclusive use of the Water and Sewer department; and (3) Garbage vehicle garage for the exclusive use of the Garbage department. It is abundantly clear that each of these buildings fulfills a purpose and function of each respective department. It is equally clear that the city is empowered to construct public buildings for such municipal purposes. Section 11-905, R.C.M. 1947. Payment of the costs of construction of buildings financed under an installment contract is authorized by the adoption of budgets for payment over the life of the installment contract. Section 11-1202, R.C.M.1947 as amended. Thus the city has general budgetary authority in respect to construction costs of these buildings.

■ The city shop complex also contains buildings and facilities to be jointly used by all city vehicles of the various departments: The combined maintenance shop and central office and lunch facility, and several open, unheated vehicle storage facilities. Can the city allocate a proportionate share of the cost of construction of these joint use buildings against the funds of each department based upon proportionate use?

While there is no express statute covering this subject, we hold that a city possesses such implied power. A city is em-

powered to build necessary public buildings, section 11-905, R.C.M.1947; the power to construct multipurpose buildings, see Lloyd v. City of Great Falls, 107 Mont. 442, 86 P.2d 395; the power to finance construction costs by installment contracts and to budget for payment thereof, section 11-1202, R.C.M.1947 as amended; and the power to give effect to powers expressly granted, section 11-901, R.C.M.1947.

Each of the city departments here involved—the Airport, Library, Park, Street, Garbage and Water and Sewer—operate motor vehicles and equipment requiring periodic maintenance and repair, all of which will be performed in the joint use facilities of the city shop complex. The operation and maintenance of these vehicles is necessary and consistent with the purposes of these departments. Each department clearly could expend its separate funds for maintenance and repair of its vehicles at a downtown garage operated by a private individual. It is equally clear that each department could commit its funds to construction of a separate repair facility for its own exclusive use, staffed by its own mechanic, and operated by its own personnel. In view of these considerations, we perceive no reason why each separate department cannot contribute these same funds to construction and operation of a joint use central repair facility in proportion to its anticipated use thereof. Nor do we see funds of the respective departments, unless otherwise obligated or prohibited, forecloses such contribution. The appropriation of a portion of such funds for construction costs of such joint use facility rests on the same authority that permits use of such funds to construct a separate repair facility for the exclusive use of each department.

Plaintiffs contend that Water and Sewer department funds cannot be committed to payment of any part of the cost of construction of the city shop complex because the funds are derived from water and sewer charges which are pledged to retirement of outstanding water and sewer bonds. Section 11-2218, R.C.M.1947 provides that a city before issuance and sale of revenue bonds must create a sinking fund and pledge the

revenues from operation thereof, "less normal, reasonable and current expenses of operation and maintenance thereof" to retirement of the bonds, and that repayment of the bonds shall constitute a first and prior lien and charge on such operational revenues. Section 11-2220, R.C.M.1947 provides that the city must keep all operational income and revenues separate and distinct from all other revenues and shall keep separate books and accounts thereof. The question thus becomes whether installment payment of construction costs of both separate and joint use facilities in the city shop complex to be used by the Water and Sewer department can be considered "normal, reasonable and current expenses of operation and maintenance" of the sewer and water system.

The cost of maintenance and repair of Water and Sewer department vehicles and equipment necessary to service the systems is clearly a normal, reasonable and current expense of the operation of the Water and Sewer department. So is an indoor facility for storage, repair and maintenance of its specialized equipment, pipe couplings, water meters, and the like. Renting such facilities or privately contracting for the performance of such services would clearly qualify as normal, reasonable and current expenses of operation because they are necessary to the functioning of the water and sewer systems without which they would not produce revenue for the retirement of water and sewer bonds. By the same token, replacement of obsolete and outgrown water and sewer maintenance facilities are normal, reasonable and current expenses. The fact that installment financing over a five year period is involved makes such facilities no less a "current" expense than a five year lease of such facilities payable in annual installments, or a five year contract for the performance of such services. As the latter clearly qualifies, so does the former on precisely the same basis.

If repayment of outstanding bonds were in jeopardy, the result might be different. In such a situation construction of a new facility for operation and maintenance of the water and

sewer system might not be a reasonable expense of their operation. Such is not the case here.

We note that the case of McClintock v. The City of Great Falls, 53 Mont. 221, 163 P. 99, cited by defendants as authority for the expenditure of surplus funds for capital improvements was written many years prior to enactment of section 11-2218, R.C.M.1947, requiring pledging of operational revenues to retirement of bonds.

■ Plaintiffs also contend that the city is without authority to commit the city's share of gasoline tax revenues, pursuant to section 84-1840, R.C.M.1947, to nonhighway purposes. This prohibition, while controlling gasoline tax revenues, has no application to street funds derived from other sources. Here, the appropriation is to come from the 12 mill levy authorized by sction 32-3001(2), R.C.M.1947, containing no such prohibition.

Proceeding to the specifics of the intended contributions of the various departments toward the cost of the joint use facilities included in the city shop complex, we refer to the additional findings of fact made by the district court in its final judgment of September 18, 1970. These findings were made upon the one disputed fact issue in this case. They disclose that the estimated total cost of the joint use buildings is $276,594; that the relative percentages of vehicle maintenance required by the various departments is: Water and Sewer department, 13.1%; Garbage department, 28.6%; Street department, 28.3%; Park department, 3.4%; Library, 2.4%; Airport, 7.3%; and general fund vehicles, 16.8%; that percentagewise these departments should contribute to the total cost the amounts first indicated; and that under the proposed plan they would only contribute the amounts last indicated: Water and Sewer department, $36,-233 proportional as against $18,000 proposed; Garbage department, $79,105.88 proportional as against $25,000 proposed; Street department, $78,276.10 proportional as against $50,000 proposed; Park department, $9,404.19 proportional as against $5,000 proposed; Library, $6,638.26 proportional as against

$5,000 proposed; and Airport, $20,191.36 proportional as against $10,000 proposed; that the difference would come from the general fund and the sale of the Hall Perry heavy duty shop; and that the amounts to be appropriated from the special funds are within the fair proportionate share of each based on comparison of expenditures for vehicle maintenance and anticipated use of the joint facilities.

Plaintiffs are bound by these findings of fact, having filed no exceptions thereto, nor moved to alter, modify or amend such findings. Nor could they reasonably do so as the findings are supported by the evidence. Plaintiffs now argue that additional work to be performed in connection with the city shop complex was not considered and cost estimates were not given covering these items. They refer to certain surveying and leveling costs, utility costs, water and sewer line costs, paving costs, fencing costs, and landscaping costs.

The proposed financing plan contains an $81,000 contingency fund for just such items. If the contingency fund should prove inadequate, reasonable proportional increases in the contributions from the special funds could be made as their anticipated contributions are well below their reasonable proportional contributions to the total cost.

Plaintiffs further complain that the general fund is not bearing its fair share of the total cost of the facility in that the $119,500 transfer into the general fund was really Fire department money and the proceeds of the future anticipated sale of the Hall Perry machine shop property properly belongs to the Garbage department and the Street department whose funds were used for its initial purchase by the city. Our previous holding that the $119,500 transfer into the general fund was a form of payment for the four city-owned lots that were a general fund asset disposes of the first contention. Concerning the second contention, the proposed contribution of the general fund to the total cost of the city shop complex far exceeds its proportionate share based on proportional use. General fund contributions to the cost of the project include: (1) $119,500

as payment for the four city-owned lots which were a general fund asset; (2) $13,587.09 appropriated from the general fund in fiscal 1969-1970; (3) a total of $40,000 to be appropriated for the Animal Control department from the general fund; and (4) estimated proceeds of the sale of the Westside Fire Station of $20,000. Thus the total contribution of the general fund, exclusive of the Hall Perry site, is approximately $193,000. The cost of the Animal Control building is $50,000 and exclusively a general fund charge; the proportionate share of the general fund based upon proportionate use of the joint use building is 16.8% of $276,594 or about $46,500. These two general fund items total approximately $96,500 which, when compared to the proposed general fund contribution of about $193,000, demonstrate the fallacy of plaintiffs' contention.

Plaintiffs also contend that any benefits received by the various departments from the city shop complex will be charged against them in the form of a service charge, and it is unfair to expect the using department to pay for construction of the facility in addition. There is simply nothing in the record to indicate that future service charges against the various departments using the city shop complex facilities will include a charge for amortization of construction costs. Accordingly, plaintiffs' contention must fail.

We hold therefore, as the district court did, that the city may make appropriations and expend from the special funds involved their fair proportionate share of the cost of construction of the joint use facilities included in the city shop complex as well as the cost of buildings used exclusively by a given department. We further hold that under the circumstances disclosed in the instant case the amounts appropriated and to be appropriated and expended for these purposes are within their fair proportionate shares of the cost of the joint use facilities and are reasonably related to the use each department will make of them.

One final matter was argued upon oral argument of this appeal although not included in the plaintiffs' brief as an issue

for review. Plaintiffs argue that the district court decided disputed questions of fact upon motions for summary judgment. This contention is not borne out by the record and plaintiffs, in any event, are foreclosed from raising this issue upon appeal as they failed to raise this issue in the district court. But to set the record straight, we note that the district court's findings of fact in its partial summary judgment were simply the agreed facts in the case. In its final judgment, on the other hand, the district court was not ruling upon a motion for summary judgment at all, but was deciding disputed questions of fact after hearing evidence from witnesses for both parties. Opportunity for cross-examination by both parties was afforded, and cross-examination of witnesses was had by each. No objection to this procedure was made. The issues were clearly spelled out by the court and all witnesses produced by either party were allowed to testify and were examined at length. The judgment does not indicate that it is a summary judgment, and the whole procedure indicates that it is not. Accordingly, plaintiffs' contention must fail.

For the foregoing reasons, the partial summary judgment of the district court entered on August 20, 1970, and the final judgment of the district court entered on September 18, 1970 are affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES DALY, JOHN C. HARRISON, and CASTLES, concur.